**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Michelle M. HETZEL, Appellant.**

**Commonwealth of Pennsylvania, Appellee,**

v.

**Brandon Bloss, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 4, 2002.

Filed March 14, 2003.

Reargument Denied May 21, 2003.

trial court did not draw the inference, we cannot either.

Victor E. Scomillio, Easton, for Hetzel, appellant.

Kepler B. Funk, Melbourne, for Bloss, appellant.

John M. Morganelli, Asst. Dist. Atty., Easton, for Com., appellee.

BEFORE: JOYCE, BENDER and BECK, JJ.

OPINION BY BECK, J.:

¶ 1 These companion appeals attack the validity of two first-degree murder verdicts handed down to husband and wife, appellants Brandon Bloss and Michelle Hetzel. The facts are lengthy and complex. Because the spouses were tried together and several of their issues overlap, we will address both appeals in this single opinion.[1] Our review leads us to affirm the judgment of sentence for each appellant.

### FACTS

¶ 2 Despite being married to Brandon Bloss (Bloss), Michelle Hetzel (Hetzel) was involved in a sexual relationship with the victim, a 19 year-old woman, Devon Guzman (Devon). Bloss was aware of the women's relationship and was angry about the attention and money Hetzel expended on Devon. He was contemplating divorce. Devon simultaneously was involved in a relationship with another woman named Keary Renner (Renner), with whom she lived. Hetzel, Renner and Devon were high school friends. Although Devon and Renner lived together, Devon met with Hetzel on a regular basis. Typically, Hetzel would arrive at Devon's father's house and ask him to call Devon. Mr. Guzman would oblige and Devon would arrive shortly thereafter.

¶ 3 On the night of June 14, 2000, Hetzel and Devon were at Mr. Guzman's home with him, his girlfriend and his sister. Everyone was drinking alcohol. Hetzel and Devon had just returned from a vacation in Puerto Rico, where they had exchanged

---

1. We have consolidated these appeals *sua* *sponte.*

rings.[2] Hetzel paid for the trip. At some point the two women began arguing. Apparently, Hetzel was upset that Devon had not moved out of Renner's residence and did not intend to do so. The women ultimately left Mr. Guzman's house, each departing in her own car.

¶ 4 When Devon arrived home, she told Renner that Hetzel had proposed to her, but that she had broken up with Hetzel and returned the rings Hetzel had given her. Renner noticed that Devon had been drinking and the women argued about Hetzel. They began a physical fight, but were interrupted by a series of pages from Hetzel's home.[3] Devon called Hetzel's number and spoke with Bloss. Renner could hear Bloss speaking to Devon and Hetzel screaming in the background. After the call, Devon informed Renner that Hetzel was sick and needed her attention. Renner insisted on accompanying Devon to Hetzel's home. When the women arrived at Hetzel's, Renner stayed in the car and heard Bloss tell Devon at the doorway that Renner would have to leave because Hetzel did not want her there. Devon came back to the car and told Renner that she was taking her home and would return to Hetzel's house. A neighbor saw Devon at the doorway and watched as she approached her car, banged on the hood, and told her passenger that she was taking her home.

¶ 5 Devon dropped Renner at their home at approximately 11:30 PM, told her there was nothing to worry about and explained that she would be back soon. Over an hour later, at approximately 12:45 AM, Renner received a call from Hetzel who told her that Devon had never returned to Hetzel's home. At 2:30 AM, Hetzel arrived at Renner's residence with Bloss. Bloss stayed in the car while Hetzel and Renner talked about Devon's disappearance. Hetzel asked Renner to call the police and report Devon as a missing person, but Renner refused to do so because Devon "left before but she always came home." Hetzel then called the Forks Township Police Department and reported Devon as missing. After giving a description of Devon to police, the women called some friends and family members in an effort to find Devon. Several times, Hetzel called police to learn whether they located Devon. Hetzel left Renner's place at about 6:30 AM.

¶ 6 Later that morning, Hetzel returned to Renner's residence with food and suggested that the women drive around Easton looking for Devon's car. At some point, Hetzel suggested they search Canal Park, a place she and Devon often visited together. At the park, they saw Devon's car. Inside the car they discovered Devon. She was covered with a green jacket and lying across the backseat with her back toward the front seat. Renner noticed that Devon's eyebrows and lips were purple and so she told Hetzel that they should take her to get help. A city employee who was present at the park told the women that police were on their way and that they shouldn't move the body. Police arrived, checked for a pulse and, finding none, called the coroner.

¶ 7 The coroner removed the green jacket from atop Devon's body and saw that Devon's throat had been cut and she had a "massive gaping laceration" to her neck. The wound was a "four inch long cut that

2. Hetzel purchased three rings while in Puerto Rico, identical bands for herself and Devon and another ring with diamonds for Devon. Devon and Hetzel called Mr. Guzman from Puerto Rico, told him they had gotten married, and asked if they could live with him when they returned.

3. Devon wore a pager.

went almost to her spine; it severed Devon's tongue and cut in half the right carotid artery and the right jugular vein." Also found on the body was a syringe containing a clear liquid. There was no cap on the syringe. Police secured the scene, insisting that Hetzel's vehicle remain in the lot. Both women were interviewed and released. Bloss too was interviewed by police later that day.

¶ 8 After their interviews with police and for a period of about six weeks, Hetzel and Bloss continued their marriage. Hetzel announced to family and friends that she was pregnant with twins, an assertion that was not true. The couple also took a vacation to Mexico together. Meanwhile, the police investigation focused on Hetzel and Bloss. Hetzel's car was searched, as was the home she and Bloss shared. The searches yielded a number of items of physical evidence. From the trunk of Hetzel's car police recovered two pairs of rubber gloves, Bloss's T-shirt and a pair of his jeans with blood that was consistent with Devon's blood, and Bloss's sweatshirt, socks and sneakers, all of which had indications of human blood, but were too weak for further testing. At the couple's home on the day after the murder, police found a pair of Hetzel's jeans soaking in the washing machine. There were no other items in the washer and the tub was filled with soapy water. In a presumptive test, the water tested positive for blood. In the pocket of Hetzel's jeans was a syringe cap that matched the open syringe found on Devon's body.[4]

¶ 9 Police also recovered physical evidence from Devon's body and her car. On the green jacket that covered her were hairs consistent with Hetzel's hair. In the car were hairs consistent with Bloss's hair.[5] Devon's pager was not clipped to her pants as Renner described last seeing it; it was found unclipped under the waistband of her pants. Police seized telephone records from the Hetzel/Bloss residence and learned that there had been numerous calls from that address to Devon's pager on the night of the murder. However, all of those calls had been erased on the pager.[6]

¶ 10 Police examination of trash set out by Hetzel and Bloss revealed numerous bandages, one of which appeared to have the pattern of a bite mark on it. Police sought and received a warrant authorizing them to photograph Bloss and the photographs that were taken revealed an injury on Bloss's left forearm. A forensic odontologist concluded that the injury was a human bite mark that was consistent with Devon's dental records.

### TRIAL

¶ 11 Hetzel and Bloss were charged with first degree murder and despite Hetzel's effort to sever the cases, they were tried jointly. In addition to the witnesses who described the course of events set out above and those who testified with regard to the investigation and forensic evidence, the Commonwealth presented other witnesses.

¶ 12 Cara Judd, a woman who had dated one of Bloss's sisters, testified that Hetzel admitted she killed Devon. According to Judd, Hetzel explained that she was very

---

4. Recovered from Hetzel's parents' home were the rings that Hetzel and Devon had purchased in Puerto Rico.

5. Also present on Devon and in her car were animal hairs. Hetzel and Bloss own a dog and one or more cats.

6. The phone records established that Devon was paged repeatedly from appellants' house until about the time she dropped Renner off at their residence.

angry that Devon brought Renner to her home on the night they argued. When Devon returned alone, the two women began to fight in Hetzel's home. Devon bit Bloss when he attempted to intervene on Hetzel's behalf. Thereafter, Hetzel grabbed a knife and the next thing she knew there was blood everywhere. Judd also testified that Hetzel told her about soaking her jeans in the washer and that Bloss had hosed down the garage where the murder had taken place.[7]

¶ 13 George Vine, a friend of Hetzel and Devon, testified that Hetzel offered him sex or money to get rid of Devon approximately two or three months before the murder.

¶ 14 Bloss presented no evidence in his defense. Hetzel, however, offered the testimony of several witnesses, including her mother, who told the jury that Bloss admitted to her that he killed Devon. Hetzel herself took the stand and testified that she was not involved in Devon's murder and that she believed Bloss committed the crime.[8]

¶ 15 The jury found both appellants guilty of first-degree murder and they were sentenced to life in prison.[9] These appeals follow the denial of post-sentence motions.

### JOINT ISSUES ON APPEAL

¶ 16 Hetzel raises eleven claims of error, one of which has two subparts. Bloss makes four allegations of error; three of them mirror claims raised by Hetzel. We address first the couple's mutual claim that the evidence presented was insufficient to sustain the verdicts. Should either Hetzel or Bloss be successful on this claim they would be entitled to a discharge, making all of their other claims moot.

### SUFFICIENCY OF THE EVIDENCE

¶ 17 When considering whether the evidence proffered at a criminal trial was sufficient to support the guilty verdict, we view the evidence and all reasonable inferences therefrom in the light most favorable to the Commonwealth to determine whether every element of the crime has been established beyond a reasonable doubt. *Commonwealth v. Gillen,* 798 A.2d 225, 230 (Pa.Super.2002). The evidence in this case overwhelmingly establishes Hetzel's and Bloss's commission of the crime.

¶ 18 The testimony and physical evidence presented at trial support the Commonwealth's theory that both appellants were angry with the victim on the night of the murder. Both had a motive to kill her (jealousy) and ample opportunity to do so. Both requested her presence in their home and insisted that she be alone. Circumstantial evidence of appellants' conduct as well as extensive physical evidence supported the Commonwealth's theory that after Devon returned to appellants' home, a confrontation among the actors ensued and Devon was brutally murdered.

¶ 19 Neither appellant admitted involvement to police, but each admitted guilt to different persons. Blood, hair and other DNA evidence tied each appellant to the murder. Although by time of trial the appellants no longer presented a united front, the testimonial and physical evi-

7. Judd typically kept a diary, and had done so for several years. She recorded her conversations with Hetzel in the diary.

8. Hetzel denied she confessed the crime to Judd. Although Hetzel conceded that several of the entries in Judd's diary were true, she insisted that the part detailing her confession was false.

9. The jury acquitted the couple of conspiracy to commit murder.

dence linked them both to this horrible crime. Finally, the manner of death clearly established intent to kill. *Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367, 1372 (use of a deadly weapon on vital part of the body sufficient to prove specific intent to kill), *cert. denied*, 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991).

¶ 20 Each spouse argues that the evidence establishes that the other spouse acted alone in killing Devon. Each insists that in order to believe that one of them committed the crime, it was necessary to believe that the other was not involved. We disagree. The Commonwealth's presentation of this case did not include an absolute conclusion of who slit Devon's throat. Rather, the prosecution argued that the couple acted together and Devon's death, which each spouse intended, was the result. The record, when viewed in the light most favorable to the Commonwealth, supports that theory. Thus, in view of all of the evidence presented, we conclude that appellants' sufficiency claims fail.

### JURY INSTRUCTIONS

¶ 21 Appellants next raise an identical challenge to a supplemental jury instruction delivered by the trial court. They argue that the court erred in its instruction regarding intent to kill, specifically, the court failed to inform jurors that an accomplice must have the specific intent to kill, otherwise he or she cannot be convicted of first degree murder.

■ ¶ 22 Our review of the record indicates that neither appellant objected to the charge of which they now complain. Indeed, after delivering the supplemental instructions, the trial judge asked whether

any of the parties had "any exceptions, corrections or whatever" and each said no. A specific challenge to a supplemental jury charge is absolutely required in order to preserve the issue for appeal. *Commonwealth v. Betz*, 444 Pa.Super. 607, 664 A.2d 600, 606 (1995) ("defense counsel must make a specific objection before the jury returns to its deliberations"), *appeal denied*, 544 Pa. 600, 674 A.2d 1065 (1996). Failure to object precludes appellate review. *Id.* Not only did appellants fail to raise an objection, they stated affirmatively on the record that they had no objection. We need not proceed to the merits of appellants' claim under these circumstances as it surely has been waived.[10]

### DISQUALIFICATION OF JUROR # 2

¶ 23 The final issue that appellants share is their claim that the trial judge erred in releasing a juror mid-trial. One evening after a day of hearing the Commonwealth's case, Juror # 2 received a call from his sister. She informed him that her husband, Juror # 2's brother-in-law, worked with Bloss's father. Juror # 2 told his sister that he would not discuss the matter and the following morning he promptly told the judge about the telephone call.

¶ 24 The trial judge, with counsel, interviewed Juror # 2 and permitted counsel to question him as well. Although Juror # 2 stated that he could be fair and decide the case based on the evidence, he also noted that his sister was upset when she called him and that he was "honestly ... a little bit" concerned about how Mr. Bloss might react toward his brother-in-law if the jury found Bloss guilty. Juror # 2 tempered his concern with the statement that "it would not affect my judgment." Following the

---

10. We observe, however, that in reciting the supplemental instructions, the court stated no less than three times that *each* actor must have the specific intent to kill in order to be convicted.

interview, the prosecutor made a motion to strike Juror # 2 for cause. The trial court granted the motion.

¶ 25 Both appellants argue that the trial court erred in granting the Commonwealth's motion to strike. The decision whether to disqualify a juror is committed to the sound discretion of the trial court and is reversible only in the event of a "palpable abuse of discretion." *Commonwealth v. Koehler*, 558 Pa. 334, 737 A.2d 225, 239 (1999), *cert. denied*, 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 41 (2000). The trial judge believed that disqualification was appropriate based on the juror's answers to questions and his demeanor. The court noted the juror's concern over his brother-in-law's position and the fact that the juror interpreted his sister as "upset." Upon review of the transcript and in light of our standard of review, we find support for the trial court's concerns and so determine there was no abuse of discretion.

### BLOSS'S ISSUE ON APPEAL
### SEARCH WARRANT

¶ 26 Appellant Bloss's final issue on appeal concerns the validity of a search warrant executed by the police, which sought from forensic odontologist Dr. Dennis Asen all "photographs, tracings or diagrams of a bite mark" on Bloss. Police initially contacted Dr. Asen several weeks after the murder and asked him to examine bandages recovered from appellants' trash. Dr. Asen told police that one of the bandages appeared to reveal the pattern of a human bite mark. Police then executed a search warrant (not challenged here) authorizing them to photograph Bloss.

Thereafter they returned to Dr. Asen and asked him to review the photographs, which showed an injury on Bloss's left forearm. In doing so, Dr. Asen stated that he recognized Bloss because he had examined him nine days earlier. Dr. Asen explained that he had photographed Bloss's wound and made tracings of it.[11] Police then sought to acquire those photographs and tracings via a search warrant. Bloss, in turn, moved to quash the warrant.

¶ 27 Bloss opposed the warrant on two bases, the attorney-client privilege and the attorney work product doctrine. The trial court rejected Bloss's claim and refused to quash the warrant. It permitted the Commonwealth to seize the photographs and tracings, but ordered any writings found on them redacted. Thereafter, the Commonwealth gave the photographs and tracings to another forensic odontologist, Dr. Michael Scanlon. Dr. Scanlon reviewed Dr. Asen's photographs and tracings and determined that they indeed showed a human bite mark.

¶ 28 The Commonwealth then acquired dental impressions for Bloss, Hetzel, Renner and the victim.[12] Dr. Scanlon reported that the bite mark was not consistent with Hetzel, Renner or Bloss's dental patterns. However, he concluded "within a reasonable degree of dental certainty that the bite pattern of Devon Guzman was the most consistent" of all those he examined. At trial, Dr. Scanlon testified to all of these events. On appeal, Bloss renews his claim that the information seized from Dr. Asen was privileged. As a result, he argues, Dr. Scanlon's testimony relying thereon was improper and a new trial is warranted.

---

**11.** As the Commonwealth explains in its brief, "Dr. Asen had been retained by Attorney Pfeiffer [Bloss's lawyer] to photograph the injury, etc." Commonwealth's Brief at 30.

**12.** Devon's body was exhumed on or about August 1, 2001, in order for dental impressions to be made.

¶ 29 "The attorney-client privilege has been a part of Pennsylvania law since the founding of the Pennsylvania colony, and has been codified in our statutory law." *Commonwealth v. Noll*, 443 Pa.Super. 602, 662 A.2d 1123, 1126 (1995), *appeal denied*, 543 Pa. 726, 673 A.2d 333 (1996). It exists to "foster a confidence between attorney and client that will lead to a trusting and open dialogue." *Commonwealth v. Chmiel*, 558 Pa. 478, 738 A.2d 406, 423 (1999), *cert. denied*, 528 U.S. 1131, 120 S.Ct. 970, 145 L.Ed.2d 841 (2000). While the privilege is statutorily mandated,[13] it has a number of requirements that must be satisfied in order to trigger its protections. First and foremost is the rule that the privilege applies *only to confidential communications* made by the client to the attorney in connection with providing legal services. *Commonwealth v. duPont*, 730 A.2d 970, 977 (Pa.Super.1999), *appeal denied*, 561 Pa. 669, 749 A.2d 466 (2000). The information Bloss sought to withhold was not confidential communications he made to his attorney. Thus, it does not fall within the protection of the attorney-client privilege.

¶ 30 However, the work product doctrine provides broader protections than the attorney-client privilege and shields from disclosure an attorney's (or his representative's) opinions, theories, or conclusions. Pa.R.Crim.P. 573(G).[14] The underlying purpose of the work product doctrine is to guard "the mental processes of an attorney, providing a privileged area within which he can analyze and prepare his client's case." *Lepley v. Lycoming County Court of Common Pleas*, 481 Pa. 565, 393 A.2d 306, 310 (1978).

¶ 31 In *Noll*, a panel of this court described the work product doctrine as one that "promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients.... [and, further] protects materials prepared by agents for the attorney." *Noll, supra*, 662 A.2d at 1126. Bloss relies on *Noll* to support his claim that the photographs and tracings are privileged because they were information gathered by an expert for purposes of rendering legal advice.

¶ 32 In *Noll*, the defendant was in an automobile accident and hired an attorney in order to pursue a civil action. The attorney engaged the services of an accident reconstruction expert to assist him. The expert met with police, surveyed the scene and visited the salvage yard as part of his investigation. The civil action was never brought, but the defendant later faced criminal charges in connection with the accident. In preparation for its case, the Commonwealth hired the same expert the defendant had utilized. When defense counsel successfully moved to preclude the Commonwealth from offering the expert as a witness at trial, this court affirmed based

---

13. The law provides that "counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose same, unless in either case this privilege is waived upon the trial by the client." 42 Pa.C.S.A. § 5916. The privilege includes confidential communications made to an expert working on behalf of the attorney in the preparation of the client's case. *Commonwealth v. Noll*, 443 Pa.Super. 602, 662 A.2d 1123, 1126 (1995).

14. The Rule provides:

   Work Product
   Disclosure shall not be required of legal research or of records, correspondence, reports, or memoranda to the extent that they contain the opinions, theories, or conclusions of the attorney for the Commonwealth or the attorney for the defense, or members of their legal staffs.
   Pa.R.Crim.P. 573(G).

on both the attorney client privilege and the work product doctrine.

¶ 33 The panel in *Noll* held that it was improper for the Commonwealth to utilize in its own case an expert who had investigated the matter for the defendant. *Id.* at 1127. Adopting the trial court's analysis of the circumstances, the panel noted that under the circumstances, it would be impossible to determine what portions of the expert's testimony should be stricken as information acquired while the expert worked on the defendant's behalf, *i.e.*, work product. *Id.* at 1126.

¶ 34 The photographs and tracings made by Dr. Asen at counsel's request and on Bloss's behalf clearly constitute work product as they are "materials prepared by agents for the attorney." *Id.* Dr. Asen's work, the act of photographing and thereafter making tracings and/or diagrams, is no different from any other investigative work performed by an agent at the behest of an attorney. It is sufficiently similar to the work accomplished by the expert in *Noll* so as to make the rationale in that case controlling.

¶ 35 We do not disregard the significant difference between this case and the *Noll* case, which is noted by both the Commonwealth and the trial court. In this case, the Commonwealth did not utilize Dr. Asen as its expert witness; instead, it engaged the services of Dr. Scanlon. But Dr. Scanlon's expert opinion regarding the match between Bloss's injury and Devon's dental pattern *was based on Dr. Asen's work product.* Thus, the very danger described in *Noll* occurred here: Attorney Pfeiffer (counsel for Bloss) while investigating and preparing his case, engaged the services of an expert and the work product that was created by that expert *was used against Pfeiffer's client.* These facts present a case even more compelling than *Noll.* The Commonwealth sought, seized and used at trial specific items of work product from counsel's agent.

¶ 36 The trial court in this case relied heavily on the fact that *Noll* involved testimony, rather than physical evidence, thus distinguishing it from this case. The Commonwealth draws our attention to other instances in which physical evidence was seized from the possession of an attorney and not deemed protected by the work product doctrine, specifically, *Commonwealth v. Stenhach,* 356 Pa.Super. 5, 514 A.2d 114 (1986), *appeal denied,* 517 Pa. 589, 534 A.2d 769 (1987), and *In Re Gartley,* 341 Pa.Super. 350, 491 A.2d 851 (1985), *aff'd,* 513 Pa. 429, 521 A.2d 422 (1987).

¶ 37 The *Stenhach* case concerned the actions of two public defenders who, after interviewing their client, recovered a rifle stock used by him in the commission of a murder. The *Stenhach* court held that the defense attorneys' possession of the rifle stock could not be protected from discovery merely because of the status of the attorneys as their client's counsel. Reviewing case law from many other jurisdictions, the *Stenhach* court adopted the majority view and held that when counsel is in possession of the physical evidence of a crime, he must turn it over to the prosecution upon motion.

¶ 38 In *Gartley,* the defendant delivered to his attorney business records that the Commonwealth sought in connection with the defendant's Medicaid fraud case. The *Gartley* court acknowledged the importance of the work product doctrine, but held that the business records did not fall within it because they were pre-existing documents that were unconnected to the attorney's work.

¶ 39 This case presents circumstances materially different than those in *Gartley* and *Stenhach.* Unlike in *Gartley,* the diagrams and tracings are not pre-existing

documents that Bloss delivered to his attorney for safekeeping. Unlike in *Stenhach,* the diagrams and tracings are not pre-existing physical evidence from the crime recovered by Bloss's attorney. Rather, the diagrams and tracings are the work product of attorney Pfeiffer's expert/agent, Dr. Asen. Because they were generated by the expert at the behest of Pfeiffer in preparation of Bloss's case, they are protected by the work product doctrine.

¶ 40 We find, therefore, that the seizure of these documents was a violation of the work product doctrine, making the use and admission of them improper. Our inquiry does not end with this conclusion, however, as we must consider whether the error was harmless.

¶ 41 "The harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial." *Commonwealth v. Drummond,* 775 A.2d 849, 853 (Pa.Super.2001). The standard for harmless error analysis is well settled. "[A]n error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict. Whenever there is a 'reasonable possibility' that an error 'might have contributed to the conviction,' the error is not harmless. . . . [A]n error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict." *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155, 165–66 (1978). Our review of the record leads us to conclude that the admission and use of the work product in this case, while clearly error, was nonetheless harmless due to the overwhelming evidence of guilt presented against Bloss.

¶ 42 In addition to the bite mark testimony of Dr. Scanlon, the Commonwealth presented an abundance of evidence linking Bloss to the murder, all of it untainted by the work product violation and all of it admissible. Bloss's involvement in Devon's activities that night was confirmed by Renner and Bloss's own neighbors. His motive and opportunity was amply demonstrated by the Commonwealth. He summoned the victim to his home and when she arrived with another person, he instructed her to return alone. Perhaps most compelling were the numerous pieces of physical evidence, and the results of forensic tests conducted thereon, that linked Bloss to Devon's murder. His clothing, found with two pairs of rubber gloves in Hetzel's trunk, was stained with the victim's blood. His hair was discovered in the victim's car. This compelling evidence was unconnected to the work product evidence and all of it implicated Bloss.

¶ 43 Further, Bloss is simply wrong when he asserts that without the evidence seized from Dr. Asen, "the jury would have never known that Mr. Bloss was ever bit [sic]." Bloss's Brief at 28. There was extensive evidence of Bloss's injury offered at trial that was wholly unrelated to Dr. Asen's work product. All of it was admissible and constituted further evidence of Bloss's guilt.

¶ 44 Detective Barry Golazeski, who investigated the case, testified that he made several "trash pulls" from appellants' house beginning about a week after the murder and continuing, once each week, for about one month. He explained that in each pull, he recovered numerous bandages that he believed showed evidence of a bite mark. Detective Golazeski thereafter obtained a search warrant to photograph Bloss and the photos revealed an injury to Bloss's left forearm.

¶ 45 Dr. Scanlon testified that at Detective Golazeski's request, he examined these bandages and photographs. He explained that as a result of that examination, he confirmed that the "wound ... in the photograph and ... the bandages resembled a human bite mark." Dr. Scanlon further noted that the wound was "too healed" for him to be able to make "a strong opinion." In addition to Dr. Scanlon and Detective Golazeski, another police officer testified that Bloss wore a long sleeve sweatshirt at his police interview on June 15th, the day of the murder.

¶ 46 All of this admissible evidence raises the inference that Bloss sustained an injury to his forearm at the time of the murder, and further, that the injury resembled a bite mark. This evidence in turn made relevant other Commonwealth testimony regarding the manner in which Devon was killed, the fact that Bloss was right-handed and the inference that the injury was a defensive wound inflicted by the victim during her struggle with Bloss.

¶ 47 In sum, all of this admissible evidence about Bloss's injury lent credence to the Commonwealth's theory of the case that a confrontation between Bloss, Hetzel and Devon occurred at appellants' home and Devon died as a result. Even without the evidence regarding Devon's dental pattern, the Commonwealth would have been permitted to argue, by inference, that the injury to Bloss's forearm resulted from a bite by the victim.

¶ 48 We do not downplay the significance of the testimony by Dr. Scanlon. Although his statement that Bloss's injury was "most consistent" with Devon's dental pattern is not as compelling as a fingerprint or DNA match, it certainly was an incriminating piece of evidence. But we cannot discount the abundance of other evidence in support of Bloss's guilt. The record reveals that the case against Bloss was established without Dr. Scanlon's reliance on work product and his opinion that Bloss's injury was "most consistent" with Devon's dental pattern.

¶ 49 We are mindful that a finding of harmless error based on overwhelming evidence is "not to be arrived at lightly." *Commonwealth v. Davis,* 452 Pa. 171, 305 A.2d 715, 720 (1973). In *Story,* our Supreme Court cautioned that in making such a finding, the "untainted evidence relied upon must be uncontradicted" to ensure that the jury's verdict would not have been different "in the absence of the tainted evidence." *Story,* supra at 416, 383 A.2d at 168. In this case, Bloss presented no contradictory evidence at trial; indeed, he presented no evidence at all.

¶ 50 In conclusion, we find that the admission of the work product, while erroneous, was also harmless and so does not warrant the grant of a new trial.

### HETZEL'S ISSUES ON APPEAL

¶ 51 With all of Bloss's claims now resolved, we are left with eight additional claims raised by Hetzel alone. Hetzel's two-page, fifty-one line statement of questions prompts us to quote the Rules of Appellate Procedure, which provide, in pertinent part:

> The statement of the questions involved ... should not ordinarily exceed 15 lines, [and] must never exceed one page.... This rule is to be considered in the highest degree mandatory, admitting of no exception."

Pa.R.A.P. 2116.

¶ 52 Cognizant that this defect alone is enough to warrant our refusal to consider Hetzel's claims, we nonetheless proceed to assess each one. *Commonwealth v. Stafford,* 749 A.2d 489, 493 (Pa.Super.), *appeal denied,* 568 Pa. 660, 795 A.2d 975 (2000).

## EXPERT TESTIMONY

¶ 53 Hetzel claims that the trial court erred in denying her motion to preclude expert testimony of state police forensic scientist Carol Ritter. Ritter testified to a number of items she tested at police labs. Among them was the washing machine water in which Hetzel's jeans were found soaking the day after the murder. Ritter explained that a presumptive test of the water showed the presence of blood, but that a confirmatory test could not be accomplished because the water sample was too weak.

¶ 54 Ritter conceded that the presumptive test [15] is not a complete certainty and there are two instances in which a false positive may occur. First, Ritter explained, performing the test improperly could cause a false positive; however, Ritter ruled out such an error when she testified that other indications established that she performed the test correctly. Second, Ritter explained that the presence of a vegetable substance, such as red beets, could cause a false positive. Hetzel claims that Ritter's testimony should have been excluded.

■■■■■ ¶ 55 A trial court's decision to allow expert testimony can be reversed only in the event the court abused its discretion or committed an error of law. *Commonwealth v. Minerd*, 562 Pa. 46, 753 A.2d 225, 229 (2000). Expert testimony is proper where it will aid the jury regarding subject matter "beyond the knowledge or experience of an average lay person." *Id.* at 230. The law is clear that an expert's conclusions need not be stated as beyond a reasonable doubt. *Commonwealth v. Stallworth*, 566 Pa. 349, 781 A.2d 110, 122 (2000). "Whether an expert's testimony is persuasive beyond a reasonable doubt is a matter for the jury's consideration." *Id.*

¶ 56 We begin our analysis by recognizing that Hetzel does not challenge Ritter's testimony based on *Frye/Blum* [16] or *Daubert*,[17] that is, she does not claim that the presumptive test utilized by Ritter is not generally accepted in the scientific community or that it is based on unreliable scientific methods. Instead, she claims that because Ritter's testimony was based only on a presumptive test, it was uncertain and, therefore, not probative. Hetzel argues that Ritter's inability to perform the confirmatory test made the results of the presumptive test "moot and uninformative." Hetzel's Brief at 19. In sum, Hetzel argues that the presumptive test results should not have been deemed admissible under Pa.R.E. 702.[18]

¶ 57 Although Hetzel failed to do so, we have researched the admissibility of presumptive blood tests. While there is no controlling case law in Pennsylvania, a number of other states have considered the very issue Hetzel raises.

---

15. A presumptive test is an initial screening test. If the test reveals the possible evidence of a substance, in this case blood, then further testing is done to confirm or refute the results of the presumptive test.

16. *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923); *Blum v. Merrell Dow Pharmaceuticals, Inc.*, 564 Pa. 3, 764 A.2d 1 (2000).

17. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

18. The general rule of admissibility of expert testimony provides:

If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand *the evidence or to determine a fact in issue*, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa.R.E. 702.

¶ 58 The test Ritter performed, the phenolphthalein (phenol) test, is one of many presumptive blood tests utilized by law enforcement nationwide.[19] The test involves the use of phenol, a chemical reagent that "causes blood and some other substances to turn a bright pink within a few seconds of application." *State v. Stenson*, 132 Wash.2d 668, 940 P.2d 1239, 1262 (1997). As Ritter explained, the phenol test does not confirm the presence of blood; it merely indicates that blood may be present, as there are other substances that trigger a positive test.

¶ 59 In considering whether presumptive test results such as the phenol test are admissible, some states hold that the test results satisfy the fundamental requirements of expert testimony in that they constitute specialized knowledge that is beyond that of the average layperson and so are helpful to the jury. *See Stenson, supra* at 1263 (collecting cases that admit presumptive tests, including *People v. Coleman*, 46 Cal.3d 749, 251 Cal.Rptr. 83, 759 P.2d 1260 (1988); *State v. Moseley*, 336 N.C. 710, 445 S.E.2d 906 (1994); *Johnston v. State*, 497 So.2d 863 (Fla.1986); *Graham v. State*, 374 So.2d 929 (Ala.Crim.App. 1979)). With regard to the possibility that some substance other than blood may trigger a positive test, courts rely on the fact that the jury was made aware of such possibilities and the issue then becomes one of weight to be accorded the evidence, not admissibility. *See Stenson, supra,* at 1264–65. *See also Commonwealth v. Duguay*, 430 Mass. 397, 720 N.E.2d 458 (1999) (fact that substances other than blood can trigger positive result in ortho-tolidine test goes to weight, not admissibil-

ity); *State v. Leep,* 212 W.Va. 57, 569 S.E.2d 133 (2002) (limitations on STD test results do not render it inadmissible; they affect only weight).

¶ 60 Our research has revealed that some states deem presumptive blood tests like phenol inadmissible where they form the basis of an expert's opinion that blood was present. *See State v. Moody,* 214 Conn. 616, 573 A.2d 716 (1990) (presumptive test alone has no probative value), *but cf. State v. Downing,* 68 Conn.App. 388, 791 A.2d 649 (2002) (permitting presumptive test results where expert also relied on other evidence that blood may be present). However, in this case Ritter did not testify that blood was present in the water she tested.

¶ 61 Ritter explained in detail the nature of the test she conducted as well as its limitations. Her opinion was not that the water *surely* contained blood, but rather that it had an indication of blood, a fact confirmed by the presumptive test she conducted. Ritter's opinion included her *caveat* that a vegetable substance, such as red beets, also may have caused the positive presumptive test. On cross-examination, Hetzel's counsel focused on the fact that the phenol test was not definitive for blood. Thus, this is not a case where the expert testified that in her opinion blood was present. Rather it is a case where the expert testified to performing a test and related the results of that test, as well as its limitations. In light of the restricted nature of Ritter's testimony and the fact that the test's limitations were exposed, we find no basis for concluding that the expert testimony was improper.

---

**19.** Other presumptive blood tests include the Leuco–Malachite Green (LMG) or "invisible blood" test, *People v. Wheeler,* 334 Ill.App.3d 273, 268 Ill.Dec. 38, 777 N.E.2d 961 (2002) (remand for *Frye* hearing on acceptance of LMG in scientific community); the luminol test, *State v. Canaan,* 265 Kan. 835, 964 P.2d 681 (1998) (luminol testing satisfies *Frye*); and the ortho-tolidine test, *Commonwealth v. Duguay,* 430 Mass. 397, 720 N.E.2d 458 (1999) (presumptive test results admissible).

¶ 62 We caution that our ruling does not address whether every presumptive test for blood, or even phenol alone, is admissible as the basis for an expert's opinion that blood indeed was present. We hold only that the test results in this case, which were not challenged under *Frye*, were admissible under general principles enunciated in Pa.R.E. 702. Ritter's knowledge of the phenol test generally and its results in this case specifically assisted the trier of fact. Any uncertainties went to the weight to be accorded the results, which defense counsel aptly brought out on cross-examination.

### *SEVERANCE*

¶ 63 Hetzel's next claim is a two-part challenge. She argues that the trial court erred in refusing to grant her severance motion and, further, that the court erred in joining her case with Bloss's because the requirements for joinder were not met.

¶ 64 The decision to grant or deny a motion for severance is committed to the sound discretion of the trial court, reversal of which is proper only in the event of an abuse of that discretion. *Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367, 1373, *cert. denied*, 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991). While joint trials are preferred in those cases in which conspiracy is charged and the evidence against one actor is the same or similar to that presented against the other actor, the law is also clear that severance is required whenever co-defendants intend to present antagonistic defenses. *Id.* However, "the mere fact that there is hostility between the defendants, or that one may try to save himself at the expense of another, is in itself not sufficient grounds to require separate trials." *Id.* See also Pa.R.Crim.P. 583 (severance may be ordered if prejudice established).

¶ 65 In this case, Hetzel surely attempted to place the blame on Bloss throughout the joint trial. She offered witnesses in support of her theory of the case and testified in a manner consistent with her innocence and her husband's guilt. However, Bloss did not present a defense that was antagonistic to Hetzel's defense. Indeed, he offered no witnesses in defense and did not testify on his own behalf. In her brief, Hetzel repeatedly refers to Bloss's defense, despite the fact that he did not present one. There was no evidence offered against Hetzel by Bloss. Every witness that testified contrary to Hetzel's interest was a Commonwealth witness. Hetzel makes specific reference to Cara Judd, the woman who testified that Hetzel confessed the crime to her. But Judd was a Commonwealth witness; she did not appear on Bloss's behalf.

¶ 66 The law requires that in order to warrant severance, a co-defendant must show a "real potential for prejudice" from a joint trial; speculation that prejudice may result is not enough, nor is mere hostility between defendants. *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491, 501 (1995), *cert. denied*, 519 U.S. 826, 117 S.Ct. 89, 136 L.Ed.2d 45 (1996). The decision to deny the severance motion in this case was not an abuse of discretion.[20]

---

**20.** In her related claim, Hetzel argues that joinder was improper because there was no evidentiary hearing in support thereof and the Commonwealth "never complied with the standards required under the Pennsylvania Rules of Criminal Procedure which are needed to *overcome a timely joinder.*" Hetzel's Brief at 24–25 (emphasis supplied). We find Hetzel's argument on this issue confusing and are uncertain of her complaint. She offers no rule or law in support of her claim and makes no substantive argument other than that excerpted above. In any event, we need not attempt to discern the basis for Hetzel's

## *VENUE*

¶ 67 Hetzel next argues that her motion for a change of venue was improperly denied. Her request was based on widespread publicity of her case and her claim that she would be prejudiced as a result. A request for change of venue is made under Pa.R.Crim.P. 584, which directs that such a change is warranted if a fair and impartial trial cannot be accomplished in the county where the case occurred. As the trial court noted:

> A request for a change of venue or venire is addressed to the sound discretion of the trial court, which is in the best position to assess the atmosphere of the community and to judge the necessity of the requested change. Absent an abuse of discretion, the trial court's decision will not be disturbed. [A] defendant is not entitled to a change of venue unless he or she can show that pre-trial publicity resulted in actual prejudice that prevented the impaneling of an impartial jury. . . . Pre-trial publicity will be presumed to have been prejudicial if the defendant is able to prove that the publicity was sensational, inflammatory, and slanted toward conviction, rather than factual and objective; that such publicity revealed the defendant's prior criminal record, if any, or referred to confessions, admissions, or reenactments of the crime by the defendant; or that it was derived from official police and prosecutorial reports. Even if the defendant proves the existence of one or more of these circumstances, a change of venue or venire is not warranted unless he or she also shows that the pre-trial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and

the trial for any prejudice to have dissipated.

*Commonwealth v. Karenbauer,* 552 Pa. 420, 715 A.2d 1086, 1092 (1998) (citations omitted), *cert. denied,* 526 U.S. 1021, 119 S.Ct. 1258, 143 L.Ed.2d 354 (1999).

¶ 68 As a result of counsel's request for a change of venue, the trial judge reviewed the media accounts of the case and considered Hetzel's claim of prejudice. The court denied the motion because it concluded that the published reports, though voluminous, were not "sensational, inflammatory nor slanted toward conviction, but [were] factual and objectively reported." Trial Court Opinion, 8/3/01, at 4. Nonetheless, the court indicated that it would revisit the issue if it became "evident during jury voir dire that the ability . . . to empanel a fair and impartial jury has been compromised by the pretrial publicity." *Id.* at 6.

¶ 69 Thereafter, jury selection in the case was thorough and careful. The court dismissed for cause all jurors who hinted at having a fixed opinion in the case or who believed they were unable to be fair or impartial. While the majority of the jurors chosen to serve had some knowledge of the case through the media, none reported that the exposure prompted a fixed opinion and all stated that they would decide the matter consistent with the court's instructions and based on the evidence presented at trial.

¶ 70 In light of the conscientious and methodical manner in which the court presided over jury selection in this case, as well as our limited scope of review, we cannot find that there was an abuse of discretion in refusing to grant the change of venue. The record simply does not reveal an extensive, sustained, or pervasive

claim; our resolution of her severance issue makes her complaint regarding joinder moot.

effect from the media coverage in this case.

## PHOTOGRAPHS

¶ 71 Hetzel's next allegation of error is set out in the following few sentences. "During the course of the Trial various objections were made and preserved to photographs of the victim's wounds. The nature of the objections were that the prejudicial value to the Jury exceeded the probative value as to these photographs related to the case. It is intended that this section of Plaintiff's [sic] Brief preserve those objections as they were made during the course of Trial." Hetzel's Brief at 25–26.

■ ¶ 72 It appears that Hetzel expects this court to peruse the trial record, take note of each time she objected to photographic evidence, consider the arguments she made and the case law, if any, upon which she relied and determine whether any of those instances warrant appellate relief. Of course, the Rules of Appellate Procedure and case law interpreting them establish that under these circumstances, Hetzel has waived her claim. See Pa.R.App.P. 2119; Commonwealth v. LaCava, 542 Pa. 160, 666 A.2d 221 (1995). However, we observe that in drafting its meticulous opinion, the trial court did just what Hetzel expected.

¶ 73 The trial court opinion sets out those instances in the record where objections to photographs were made and discusses the substance of the photos and the basis for their admission. We have reviewed those instances and agree with the trial court that admission was proper.[21]

■ ¶ 74 The viewing of photographic evidence in a murder case is, by its nature, a gruesome task. But photographs of a corpse are not inadmissible per se. Commonwealth v. Henry, 550 Pa. 346, 706 A.2d 313, 333 (1997). Rather, the court must conduct a two-part test to determine admissibility. Id. First, the court must decide if the photos are inflammatory. If not, they are admissible. If they are inflammatory, the court must balance the evidentiary need for the photos against the likelihood that they will inflame the minds and passions of the jurors. Where the evidentiary value exceeds the inflammatory danger, admission is proper. Id.

■ ¶ 75 In scanning the record to discover which photographs might be those Hetzel was complaining about on appeal, the court noted Exhibit No. 38, which included color photographs that showed the victim's wounds. The court noted that the photographs' probative value was clear because the photos were relevant to show the "nature of the wound and to help the jury understand the forensic pathologist's process of deduction." Trial Court Opinion, 3/1/02, at 45. We agree with the trial court that such photographs, while admittedly disturbing, "possessed essential evidentiary value sufficient to outweigh the possibility that they would inflame the jury." Id. at 45–46.

■ ¶ 76 The court also considered the admissibility of Exhibit No. 1, which included photographs of the victim's body upon discovery in the back of her car. There was a photo of Devon with the green jacket over her back and another with the jacket removed, making her bloodstained sweatshirt visible. The trial court found these photos probative of two important issues in the case. First, the

---

21. To the extent Hetzel intended to object to photographs *not* mentioned by the trial court, we find her claim waived.

photographs supported the coroner's testimony that the murder did not occur in the car. Second, the photographs contradicted Hetzel's testimony that she saw blood (and no green jacket) when she first observed the victim. We agree with the trial court that these photographs were admissible under the standard set forth in *Henry*.

### CORONER'S TESTIMONY

¶ 77 Hetzel next argues that the trial court erred in allowing the coroner, Mr. Zachery Lysick, to testify "beyond his statutory authority." Hetzel does not elaborate on exactly what she means by statutory authority and makes no citations to statute. It appears however, that she opposed the portion of Lysick's testimony that referred to the drag patterns on the victim's clothes, which led Lysick to believe that more than one person moved the body.

¶ 78 Assuming that this issue is not waived for failure to refer to relevant authority, we nonetheless find it meritless. Even if we were to conclude that Lysick's opinion exceeded his area of expertise, we would find the error harmless in light of the vast evidence of Hetzel's guilt. *Commonwealth v. Story, supra.*

### PRIOR THREATS

¶ 79 Hetzel's next claim concerns evidence she sought to present at trial. On cross-examination of Mr. Guzman, counsel for Hetzel attempted to elicit testimony regarding statements made by Devon to her father describing threats allegedly made by Bloss. Outside the hearing of the jury, Hetzel's attorney made an offer of proof. Apparently, in an interview some time after the murder, Mr. Guzman related to police that Devon told him Bloss had once threatened to "kick her ass." Counsel argued over the admissibility of the statement and whether it fell within any exception to the hearsay rule. Ultimately, the court ruled that the evidence would not be admitted because it was too far removed in time from the date of the actual murder. Referring to a number of cases that permitted admission of recent victim statements regarding threats by or fear of the defendant, the trial court in its opinion reasons:

> The instant case is a far cry from the cases cited above. The alleged statements to the victim made by Brandon Bloss in this case occurred *over five months prior* to the date of the murder.... The statements are simply too remote from the incident in question to be probative .... We cannot agree that threats made five months before the murder are relevant.

Trial Court Opinion, 3/1/02, at 55–56 (emphasis in original).

¶ 80 We begin our analysis by noting that the admission of evidence is an issue left to the discretion of the trial court. *Commonwealth v. Ragan*, 538 Pa. 2, 645 A.2d 811, 818 (1994). We further note that often statements such as these are combined with the victim's statement of intention to meet or confront the defendant and so are admissible to show that the victim intended to have contact with defendant, whom she feared. *See, e.g., Commonwealth v. Collins*, 550 Pa. 46, 703 A.2d 418, 425 (1997), *cert. denied*, 525 U.S. 1015, 119 S.Ct. 538, 142 L.Ed.2d 447 (1998); *Commonwealth v. Sneeringer*, 447 Pa.Super. 241, 668 A.2d 1167 (1995), *appeal denied*, 545 Pa. 651, 680 A.2d 1161 (1996).

¶ 81 In light of our standard of review, we find no abuse of discretion in the trial court's decision to preclude the testimony. The nature of the threat was not particularly probative and the remoteness of the threat militated against its

admission. Further, we note that even if the statement should have been admitted, its exclusion was harmless as there was ample evidence on the record that Bloss resented the victim and her relationship with his wife. There is no merit to Hetzel's claim.

### JURY DELIBERATIONS

¶ 82 Hetzel next claims that she was denied a fair trial when the trial court permitted jury deliberations to extend until just past midnight.[22] She concedes that the court gave the jury the choice of continuing deliberations or going home. She further admits that no juror indicated his or her wish to "convene in the morning when minds were fresh." Hetzel's Brief at 31. Nonetheless, in a single sentence of argument, Hetzel maintains that her right to a fair trial was compromised.

¶ 83 In reviewing this claim we apply an abuse of discretion standard to determine whether the verdict was the "product of coercion of an overworked or fatigued jury." *Commonwealth v. Bridges*, 563 Pa. 1, 757 A.2d 859, 881 (2000), *cert. denied*, 535 U.S. 1102, 122 S.Ct. 2306, 152 L.Ed.2d 1061 (2002). Assuming for the sake of argument that Hetzel preserved this claim,[23] we find no abuse of discretion. The jurors were given the opportunity to depart for the evening and chose not to do so. The court acted properly.

### POLYGRAPH EVIDENCE

¶ 84 Hetzel's final claim is that the trial court erred when it refused to permit her to cross-examine Renner regarding a polygraph test she had taken. In a pretrial motion, Hetzel sought to use both statements and polygraph results from Ren-

ner's contact with police in the days following the murder. The statements made by Renner concerned her denial that she was romantically involved with Devon. The polygraph focused on whether Renner was involved in the murder and the results were "Inconclusive/No opinion."

¶ 85 In an opinion addressing the issue, the trial court ruled that Renner's statements to police indeed would be admissible on cross-examination. However, the court ordered that reference to the polygraph and its results would not be permitted.

¶ 86 The law regarding admission of polygraph tests has changed little in the years since such tests have been administered. Due to the well-known unreliability of the tests, our courts uniformly have been "reluctant to permit any reference to a polygraph examination to be made before the finder of fact." *Commonwealth v. Miller*, 497 Pa. 257, 439 A.2d 1167, 1170 (1982). The current rule is that "any reference to a [polygraph test] which raises an inference concerning the guilt *or innocence* of a defendant is inadmissible." *Commonwealth v. Watkins*, 750 A.2d 308, 315 (Pa.Super.2000) (emphasis supplied).

¶ 87 Clearly, Hetzel attempted to offer Renner's inconclusive polygraph test results in an effort to prove her own innocence. In light of the established law on this issue, the trial court did not err in precluding this evidence.

### CONCLUSION

¶ 88 After a careful and thorough examination of appellants' claims, the parties' briefs and the accompanying record, we

---

22. The jury reached its verdicts shortly after midnight.

23. There is no record of any objection by counsel.

find no basis for granting appellate relief. The judgments of sentence are affirmed.

¶ 89 Judgments of sentence affirmed.