**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Gerald A. SANDUSKY.**

**Appeal of Karl E. Rominger, Esq.**

Superior Court of Pennsylvania.

Submitted May 20, 2013.
Filed July 12, 2013.

Karl E. Rominger, Carlisle, for appellant.

Joseph E. McGettigan, III, PA Office of Attorney General, Norristown and James P. Barker, PA Office of Attorney General, Harrisburg, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., PANELLA, J., and COLVILLE, J.*

OPINION BY STEVENS, P.J.

Karl E. Rominger, Esquire, appeals from the June 26, 2012 protective order entered in the Court of Common Pleas of Centre County, which was entered in response to the "leaking" of certain discovery evidence to the media following Gerald Sandusky's criminal jury trial. The order directed, *inter alia*, Gerald Sandusky's criminal defense attorneys to disclose to the trial judge and the supervising judge of the grand jury, under oath, "an inventory identifying all materials supplied to them in discovery and which was subsequently delivered to any member of the defense team ... or to any other person or entity in order to assist th[e] [lower] court and the investigating grand jury to take appropriate action to address the interests sought to be protected by [the] order." After a careful review, we quash, in part, and affirm, in part.

The relevant facts and procedural history are as follows: On November 4, 2011, and December 7, 2011, following a grand jury investigation and presentment, the Pennsylvania Attorney General's Office filed criminal complaints against Gerald Sandusky charging him with fifty-two counts of offenses related to the sexual abuse of teenaged and pre-teenaged boys. Attorneys Joseph Amendola and Karl E. Rominger entered their appearance on behalf of Gerald Sandusky, and discovery ensued. Following the selection of a jury, testimony commenced in Gerald Sandusky's criminal case on June 11, 2012, and on June 22, 2012, the jury convicted Gerald Sandusky on forty-five counts related to the sexual abuse.[1] The trial court revoked Gerald Sandusky's bail and ordered a presentence investigation of Gerald Sandusky.

Meanwhile, on June 26, 2012, pursuant to a request made by the Attorney General's Office, the Honorable John M. Cleland, S.J., who presided over Gerald Sandusky's criminal jury trial, and the Honorable Barry F. Feudale, S.J., who was the supervising judge of the grand jury, held a hearing at which members of the Attorney General's Office, as well as Attorneys Amendola and Rominger, were present. The purpose of the hearing was to determine whether a protective order was required to assure the integrity of the ongoing criminal investigations, to protect the privacy of the victims, and to protect the privacy of others who may testify or had testified before the grand jury. During the hearing, Chief Deputy Attorney Frank G. Fina, Esquire, of the Attorney General's Office, indicated, in relevant part, the following:

> The Office of Attorney General has been contacted by the media fairly extensively over the last two to three days with information as a result of the prosecution of [Gerald] Sandusky. This information has been getting increasingly detailed ... [a]nd has involved information beyond that which was disclosed at the trial and during the proceedings.
>
> This came to a head yesterday when the Office was contacted with specific information that the recording that was made of Matthew Sandusky's interview with the Office of Attorney General had been disclosed to the media and that they were going to play the recording publicly.
>
> That, in fact, has now occurred this morning on *The Today Show*. Excerpts of the tape-recorded interview of Mat-

---

* Retired Senior Judge assigned to the Superior Court.

1. The trial court dismissed several charges and the jury found Gerald Sandusky not guilty on three counts.

thew Sandusky have been played publicly.

In addition, there have been questions asked of the Office of Attorney General regarding grand jury testimony that was given, both by witnesses who testified at trial and by individuals who did not testify at the trial. The Office of Attorney General has significant concerns about, first of all, the use of grand jury information disclosure to the public or to third parties, and this is a concern that the office had—that we have had pretrial and even during the trial.

I want to be specific. I'm talking about information that was not disclosed during the trial. There is no question that grand jury information disclosed at any criminal proceeding becomes public information and that the secrecy provisions, absent some extraordinary circumstance, would no longer apply.

I'm talking about information that was not disclosed as part of the proceedings in this case. As I think both Your Honors are aware, this concern was previously raised in at least one hearing and I believe in two hearings about the potential future use of discovery in grand jury materials in this case.

Additionally, the Commonwealth has concerns about items turned over under Rule 573 and/or under the *Brady* case, *Maryland versus Brady*, about the post-trial public disclosure of those materials which it's certainly a novel issue and one that I can't find any law on. But I'm aware of no provision or authority for the post-trial disclosure of discovery information of criminal investigative information that was not disclosed during the trial and yet is now being disclosed publicly. I would assert it's outside of the rules that apply to discovery and outside of the law to do so.

I think it also raises questions that are beyond the ken of this Court perhaps in conflict of interest and issues whether or not such disclosures are in the best interests of Mr. Sandusky, an odd situation for the Commonwealth to be in to be arguing the best interests of Mr. Sandusky but nonetheless one that I think may be appropriate to raise to the Courts at this time.

It's the Commonwealth's desire—obviously, it's ultimately up to the Courts, but it's the Commonwealth's desire that inquiry be made and about these disclosures, how they occurred, and some control, if possible, be asserted over any future disclosures of either the discovery information or grand jury information that are in the possession of the defense.

The Commonwealth is willing to provide and able to provide testimony, for example, about our procedures and the controls that we have had over the taped interview of Matthew Sandusky. We believe we can state very clearly who had copies, how our copies were maintained and secured.

N.T. 6/26/12 at 4–7.

Attorney Amendola responded to Chief Deputy Attorney Fina's comments, in relevant part, as follows:

I can tell both Your Honors I haven't shared the information I received from the Commonwealth with anybody. It's still in my files.

I know that—I know that I received the [oral] tape[d] disc from the Commonwealth concerning Matt[hew] Sandusky's [statement]. I gave that copy to Mr. Rominger to review because there was no [written] transcript. Even though the cover letter indicated there was a [written] transcript, Your Honors, there wasn't. I didn't have the time in the middle of trial to spend 45 minutes. I was working every night four or five,

six hours getting ready for the next day. I asked Mr. Rominger to review that to see what Matt[hew] Sandusky said. Everything that I received from the Commonwealth, besides copies that went to people involved in the defense team, stayed with me. In fact, the files are still in my vehicle.

That's the best I can tell you. I didn't share it with anybody. Nobody got a copy of stuff publicly other than the people on the defense team from me. N.T. 6/26/12 at 7–8.

As it pertained to Matthew Sandusky's grand jury testimony, Judge Feudale clarified on the record that he authorized the Commonwealth turning over to Gerald Sandusky's criminal defense team transcripts of grand jury testimony in advance of the witnesses' trial testimony rather than after the witnesses had testified. N.T. 6/26/12 at 8–9. Judge Feudale indicated that Matthew Sandusky had testified during the grand jury proceedings, and therefore, he would assume that the grand jury transcripts of his testimony were given to Gerald Sandusky's defense team prior to trial. N.T. 6/26/12 at 8–9. Chief Deputy Attorney Fina indicated, "Yes, Your Honor. We turned over the transcripts not only of the witnesses who testified at trial but the transcript of any witness who was a potential Commonwealth witness or defense witness." N.T. 6/26/12 at 9. He specifically stated, "That would have included the testimony of Matthew Sandusky." N.T. 6/26/12 at 9. Thus, Chief Deputy Attorney Fina indicated that, although Matthew Sandusky did not testify during the jury trial of his father, Gerald Sandusky, the transcript from his grand jury testimony was given to Attorneys Amendola and Rominger prior to trial. N.T. 6/26/12 at 9.

Attorney Amendola reiterated that he received from the Commonwealth the transcript of Matthew Sandusky's grand jury testimony; however, he informed the court he never reviewed it. N.T. 6/26/12 at 10. Attorney Amendola told Judges Cleland and Feudale that:

[A]ny reference I made to Matt[hew] Sandusky had to do with Matt[hew] Sandusky coming back to State College after he testified and telling his family that he had testified and that basically he told everybody that his father hadn't done anything with him. That's where I had my reference in terms of whatever Matt[hew] Sandusky—what I anticipated him saying. We were going to call him as our witness, Judge. Up until the Commonwealth had told us what it told us mid-trial, we had gone into the trial thinking that Matt[hew] was going to be a defense witness.

N.T. 6/26/12 at 10–11.

Attorney Amendola confirmed that Matthew Sandusky was listed as a defense witness; however, in the end, the defense did not call Matthew Sandusky to testify during his father's criminal trial. N.T. 6/26/12 at 10–11. Attorney Amendola denied that his intention to call Matthew Sandusky to testify, and his eventual decision not to do so, had anything to do with Matthew Sandusky's grand jury testimony since Attorney Amendola never reviewed such. N.T. 6/26/12 at 11.

Chief Deputy Attorney Fina informed the court that, on June 14, 2012, after testimony commenced in Gerald Sandusky's jury trial, Matthew Sandusky appeared at the Attorney General's Office and made a verbal statement. N.T. 6/26/12 at 12. Without counsel, Matthew Sandusky returned to the Attorney General's Office on June 15, 2012 and made a tape-recorded verbal statement. N.T. 6/26/12 at 12. Chief Deputy Attorney Fina represented that, "Within I think it was an hour of the tape being completed, it was

driven over to Attorney Amendola." N.T. 6/26/12 at 13. The matter, which was played on *The Today Show*, was not related to Matthew Sandusky's grand jury testimony; but rather, it was the tape-recorded verbal statement Matthew Sandusky made to the Attorney General on June 15, 2012. N.T. 6/26/12 at 13. However, Chief Deputy Attorney Fina indicated that, inasmuch as the media had made references to Matthew Sandusky's grand jury testimony being inconsistent with his subsequent June 15, 2012 taped-statement, the Commonwealth had concerns about whether the transcript from Matthew Sandusky's grand jury testimony had been released to the media. N.T. 6/26/12 at 14. Consequently, Chief Deputy Attorney Fina indicated, although there is a "continuing investigation" against Gerald Sandusky, "the future use of [Matthew] Sandusky as a grand jury witness now is problematic." N.T. 6/26/12 at 14.

In response to Chief Deputy Attorney Fina's argument, Attorney Rominger indicated the following:

> I have not read the Matt[hew] Sandusky grand jury transcript either. Any references I made again are based upon our representations from Matt[hew] himself to his father that he told the grand jury nothing had happened. In fact, I believe Matt[hew] Sandusky actually helped us carry boxes for his father in on Monday morning of trial. So that was a complete surprise when he switched sides.

N.T. 6/26/12 at 14–15.

Attorney Rominger indicated he received from Attorney Amendola Matthew Sandusky's June 15, 2012 tape-recorded statement a few days after it was recorded at the Attorney General's Office, and he kept the disc in his hotel room and car. N.T. 6/26/12 at 15.

Chief Deputy Attorney Fina informed Judges Cleland and Feudale that the Commonwealth was seeking protective orders for the following matter: (1) grand jury testimony, which had not been disclosed during the course of the public proceedings at trial, (2) information pertaining to victims, unnamed victims, and other potential victims of Gerald Sandusky, (3) "a protective order under Rule 573, subsection f, . . . pertaining to investigative reports and material that were provided in discovery that were not made public during the proceedings," and (4) "any other information, which should not be disseminated to third parties without further court order." N.T. 6/26/12 at 15–16. Chief Deputy Attorney Fina indicated such protective orders would protect the ongoing nature of the investigation, the named and unnamed victims in the case, and the integrity of the judicial process. N.T. 6/26/12 at 16. He noted that there was a "great deal" of "highly incriminating" evidence against Gerald Sandusky, which was revealed during discovery but not used by the parties during the jury trial. N.T. 6/26/12 at 17. Thus, he questioned whether it would be in Gerald Sandusky's "best interest," or "anybody's best interest," to have additional incriminating information, beyond that presented during the jury trial, revealed to the public post-trial. N.T. 6/26/12 at 17.

Upon questioning by Judge Cleland, Chief Deputy Attorney Fina informed the court he was the person who interviewed Matthew Sandusky for purposes of the June 15, 2012 tape-recorded statement and he made three audio copies of the statement. N.T. 6/26/12 at 19. One audio copy was kept at the Attorney General's Office as evidence, a second audio copy was kept in evidence with the Pennsylvania State Police under the supervision of Corporal Dombrowski, and a third audio copy was

delivered to Attorney Amendola's office.[2] N.T. 6/26/12 at 19. No other audio copies were made by the Commonwealth. N.T. 6/26/12 at 19. Chief Deputy Attorney Fina informed the court that a written transcript of the audio recording was made by the Commonwealth; however, no copy of the written transcript was provided to the defense. N.T. 6/26/12 at 20. However, the portion of Matthew Sandusky's June 15, 2012 interview, which was released to and played on *The Today Show*, was actual audio excerpts. N.T. 6/26/12 at 20. Chief Deputy Attorney Fina confirmed the audio excerpts released on *The Today Show* were "exact duplicate[s]" of the verbal statement Matthew Sandusky gave to the Commonwealth. N.T. 6/26/12 at 21.

Upon questioning by Judge Cleland, Attorney Amendola confirmed he received the audio copy of Matthew Sandusky's interview from the Commonwealth and, without listening to it, he gave it to Attorney Rominger. N.T. 6/26/12 at 21. Attorney Rominger confirmed he stored the audio copy "with all of [his] Sandusky materials" in his vehicle. N.T. 6/26/12 at 21. He denied making any copies of the audio recording. N.T. 6/26/12 at 22.

At this point, Judge Cleland directed that, at the conclusion of the hearing, Attorney Rominger was to retrieve his copy of the audio recording from his vehicle and give it to the court as it was going to be subject to the protective order. N.T. 6/26/12 at 21–22. Judge Feudale stated, with clarity, that the transcript of Matthew Sandusky's grand jury testimony was not to be disclosed to third parties and he was entering a protective order in this regard. N.T. 6/26/12 at 24. Chief Deputy Attorney Fina asked that the protective order be extended to the grand jury testimony of other potential victims and those witnesses "relating to Penn State University," and without objection by Attorneys Amendola or Rominger, Judge Feudale agreed. N.T. 6/26/12 at 25. Attorney Rominger noted a protective order might also be appropriate as it relates to exhibits from the grand jury proceedings. For instance, he indicated the following:

> While we're airing our concerns, I have been asked by several media representatives who claim to have seen e-mails from Graham Spanier and the handwritten notes between Curley and Schultz which were showed to us—I believe they were shown to us briefly at a hearing on a continuance, Judge, when the Commonwealth was attempting to show that Curley and Schultz would not be viable witnesses.
>
> I find it fascinating that these media members can quote specifically out of those materials which are not in the public record which are grand jury materials.

N.T. 6/26/12 at 26–27.

In response, Chief Deputy Attorney Fina indicated:

> [T]hat's a significant concern and it's one of the concerns that I have and one of the reasons that I'm very anxious to get protective orders if possible. I mean, those—copies of those e-mails and handwritten notes were turned over in this case in discovery and they're in the possession of the defense. Unfortunately, copies of those also are held by Penn State who was, you know, the originator of them—one of the sources for them.
>
> So, I mean, that's a grave concern for us as well and the possession of those by Penn State is beyond the ken of this

---

2. The Commonwealth provided Judges Cleland and Feudale with a receipt indicating Diane Amendola signed for the audio copy at 4:53 p.m. on June 15, 2012.

hearing but that's something we'll have to address at some other point.

N.T. 6/26/12 at 27.

Chief Deputy Attorney Fina noted that both parties were receiving phone calls from the media seeking comments about matters, which had not been disclosed publicly as part of Gerald Sandusky's jury trial, and therefore, it was necessary to have a broad protective order covering more than just information related to Matthew Sandusky. N.T. 6/26/12 at 28. The following relevant exchange then occurred between Judge Feudale and the attorneys:

> JUDGE FEUDALE: ... I mean, I heard Mr. Fina make the request. It sounds like I was narrowing my protective order but my understanding is that [neither] Mr. Amendola nor Mr. Rominger object to both judges entering a protective order that precludes the discovery of any information that did not come out in the public proceeding or trial and that a protective order would cover those materials, a broad protective order—
>
> MR. FINA: Yes, Your Honor.
>
> JUDGE FEUDALE: Is that correct?
>
> MR. AMENDOLA: Yes.
>
> MR. ROMINGER: No objection.
>
> JUDGE FEUDALE: No objection?
>
> MR. AMENDOLA: No objection.
>
> JUDGE FEUDALE: Okay.
>
> JUDGE CLELAND: I will certainly draft an order now and get it filed this morning.
>
> MR. FINA: Thank you.
>
> JUDGE FEUDALE: All right. I will do likewise, maybe not this morning.
>
> \*   \*   \*
>
> JUDGE FEUDALE: ... I said it before but both [Judge Cleland and I] are dealing with a complex, controversial, and continuing evolving case but from

my perspective, the grand jury investigation continues. I don't determine what witnesses are to be called and not called. I have a responsibility for secrecy and also facilitating the grand jury investigative process. I heard both attorneys indicate they're not going to be causing any difficulty with regard to the framework of the protective order that both of us are going to be entering. Neither do I want coercive sanction type of proceedings if we can avoid that.

N.T. 6/26/12 at 29–30.

Following the hearing, on June 26, 2012, Judge Cleland entered the following order:

> AND NOW, June 26, 2012, it appearing that a protective order is required to assure the integrity of ongoing criminal investigations to protect the privacy of victims who testify, or who have testified, before the Investigating Grand Jury; and upon consent of all counsel, and in conjunction with the Supervising Judge of the Investigative Grand Jury; and pursuant to Pa.R.Crim.P. 573(F); it is ordered as follows:
>
> 1. That no material provided by the Commonwealth to [Gerald Sandusky's] attorneys or to any members of the defense team (whether supplied as mandatory discovery, discretionary discovery, *Brady* material or otherwise) and which was not made part of the record during the trial of the case, shall not be disclosed to any person or entity not directly involved in the defense of [Gerald Sandusky's] criminal prosecution.
>
> 2. That counsel for [Gerald Sandusky's] defense shall provide to the Court and to the Supervising Judge of the Grand Jury, under oath, within 10 days, an inventory identifying all materials supplied in discovery and which was subsequently delivered to any member of the defense team (exclu-

sive of counsel and immediate office staff) or to any other person or entity in order to assist this Court and the Investigating Grand Jury to take appropriate action to address the interests sought to be protected by this order.[3]

Judge Cleland's Order filed 6/26/12 at 1–2 (footnote in original).[4]

On July 6, 2012, Attorney Amendola filed a document, under seal, which Judge Cleland deemed to contain the necessary information required by paragraph 2 of the June 26, 2012 order. Attorney Rominger did not respond to the June 26, 2012 order and, one week after the deadline to respond had passed, Judge Cleland reminded Attorney Rominger he was required to comply with the order. *See* Judge Cleland's Pa.R.A.P. 1925(a) Opinion filed 9/20/12 at 2. On July 12, 2012, Attorney Rominger filed an appeal to this Court, indicating it was a "collateral appeal."[5] He simultaneously filed a Pa.R.A.P. 1925(b) statement, and Judge Cleland filed a brief Rule 1925(a) opinion urging, *inter alia*, this Court to quash Attorney Rominger's appeal.

■ Initially, we must determine whether Judge Cleland's June 26, 2012 order is appealable. Attorney Rominger suggests the order is appealable as a collateral order.

With limited exceptions, Pennsylvania law permits only appeals from final or-

ders. *See* Pa.R.A.P. 341 ("[A]n appeal may be taken as of right from any final order."). Final orders are those that dispose of all claims and all parties, are explicitly defined as final orders by statute, or are certified as final orders by the trial court or other reviewing body. *Commonwealth v. Harris*, 612 Pa. 576, 32 A.3d 243, 248 (2011) (citations and footnote omitted).

■ Here, there is no doubt that Judge Cleland's June 26, 2012 order is not a final order.[6] However, promulgated in 1992, Pa.R.A.P. 313 codified the collateral order doctrine, which under limited circumstances permits an appeal from non-final orders. Specifically, Rule 313 provides, as follows, in pertinent part:

(a) **General rule.** An appeal may be taken as of right from a collateral order of an administrative agency or lower court.

(b) **Definition.** A collateral order is [1] an order separable from and collateral to the main cause of action [2] where the right involved is too important to be denied review and [3] the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.

Pa.R.A.P. 313 (bold in original).

Case law has clarified how appellate courts should apply the three-part anal-

---

3. Any reciprocal order directed to members of the prosecution team will fall within the prerogative of the Supervising Judge of the Investigating Grand Jury.

4. This Court has not been provided with any protective order, which may have been filed by Judge Feudale in his capacity as Supervising Judge of the Investigating Grand Jury related to his matter.

5. Following the instant notice of appeal, Gerald Sandusky was sentenced with regard to

his criminal convictions, and he has filed an appeal to this Court, which is docketed at 338 MDA 2013 and 343 MDA 2013, and will be addressed by this Court in a separate decision.

6. Moreover, since Attorney Rominger did not seek permission to appeal, the order does not fall under those rules permitting an appeal by permission. *See Mortgage Electronic Registration Systems, Inc. v. Malehorn*, 16 A.3d 1138 (Pa.Super.2011).

ysis under the collateral order doctrine. For the first prong of the analysis under Pa.R.A.P. 313(b), a court must determine whether the issue(s) raised in the order 'are separable from the central issue' of the ongoing litigation. Under the second prong, in order to be considered too important to be denied review, the issue presented 'must involve rights deeply rooted in public policy going beyond the particular litigation at hand.' '[A]n issue is important if the interests would potentially go unprotected without immediate appellate review of that issue are significant relative to the efficiency interests sought to be advanced by the final judgment rule.' Furthermore, with regard to the third prong of the analysis, our Supreme Court explained that 'whether a right' is 'adequately vindicable' or 'effectively reviewable,' simply cannot be answered without a judgment about the value interests that would be lost through rigorous application of a final judgment requirement.

*Mortgage Electronic Registration Systems, Inc. v. Malehorn,* 16 A.3d 1138, 1142 (Pa.Super.2011) (quotations, quotation marks, citations omitted).

"All three prongs of Rule 313(b) must be met before an order may be subject to a collateral appeal; otherwise, the appellate court lacks jurisdiction over the appeal." *Harris,* 32 A.3d at 248 (citation and footnote omitted). Moreover, noting the discretionary process of seeking allowance of appeal by permission may be undermined by an overly permissive interpretation of Rule 313, our Supreme Court has adopted a narrow construction of Rule 313. *See Rae v. Pennsylvania Funeral Directors Ass'n,* 602 Pa. 65, 977 A.2d 1121 (2009). That is, our Supreme Court has adopted an "issue-by-issue application" of Rule 313. *See id.* Therefore, "the collateral order rule's three-pronged test must be applied independently to each distinct legal issue over which an appellate court is asked to assert jurisdiction pursuant to Rule 313." *Rae,* 602 Pa. at 80, 977 A.2d at 1130. Accordingly, we must review the issues presented by Attorney Rominger to determine whether the issues are entitled to collateral review. *See Pilchesky v. Gatelli,* 12 A.3d 430, 437 (Pa.Super.2011). If so, then we shall review the merits thereof. *See id.*

■ In the case *sub judice,* Attorney Rominger's first issue is Judge Cleland had no authority to issue a protective order directing Gerald Sandusky's criminal defense attorneys to provide, under oath, an inventory identifying all material supplied to them in discovery, which was subsequently delivered to any member of the defense team or other person/entity. That is, Attorney Rominger contends paragraph two of the June 26, 2012 order improperly violates the work-product doctrine since it requires defense counsel to disclose to whom, including experts and other people consulted by the defense attorneys, discovery materials were provided.

With regard to Attorney Rominger's first issue, we have no difficulty concluding his issue alleging improper disclosure in violation of the work-product doctrine is separable from the main cause of action, i.e., Gerald Sandusky's criminal proceedings. That is, resolution of whether the information should be disclosed is separable from whether Gerald Sandusky is guilty of the crimes for which he was convicted. *See Commonwealth v. Kennedy,* 583 Pa. 208, 876 A.2d 939 (2005) (discussing separability under collateral order doctrine). Moreover, in light of our Supreme Court's recent Opinion in *Commonwealth v. Harris, supra,* we have no difficulty concluding Attorney Rominger's first issue alleging improper disclosure in violation of the work-product doctrine involves

a right too important to be denied review since "claims of privilege implicate rights rooted in public policy, and impact individuals other than those involved in the litigation." *Harris*, 612 Pa. at 585, 32 A.3d at 248 (citing and reaffirming *Ben v. Schwartz*, 556 Pa. 475, 729 A.2d 547 (1999)).[7] As to whether the issue is such that it will be irreparably lost if review is postponed, our Supreme Court in *Harris*, while reaffirming *Ben* and rejecting the United States Supreme Court's opinion in *Mohawk Industries Inc. v. Carpenter*, 558 U.S. 100, 130 S.Ct. 599, 175 L.Ed.2d 458 (2009),[8] held:

> [W]e reaffirm our position in *Ben* that once material has been disclosed, any privilege is effectively destroyed. Privileges exist as a rule to promote frank discussions, and we respectfully disagree with the United States Supreme Court that disallowing immediate appeals will not chill such discussions.... A rule requiring parties to wait until final judgment to appeal an order overruling a claim of privilege would both cause the privilege-holder's fears to be realized and deprive the privilege-holder of any meaningful remedy.... Once putatively privileged material is in the open, the bell has been rung, and cannot be unrung by a later appeal.

*Harris*, 612 Pa. at 586, 32 A.3d at 249 (citations omitted).

In this same vein, our Supreme Court specifically rejected the notion that there existed adequate alternate methods for obtaining review of orders rejecting a claim of privilege. *See id.* Specifically, our Supreme Court noted Pennsylvania's rules relating to interlocutory appeal by permission and *writ of mandamus* may not generally permit review of such orders. *See id.* Moreover, our Supreme Court indicated:

> [T]he option of disobeying a disclosure order and being thus subject to discovery or contempt sanctions as a way of obtaining review is so extreme as to be no option at all. That method would require parties to expose themselves to the full range of sanctions from fines to imprisonment. Such potentially severe ramifications are too likely to coerce parties unfairly into abandoning meritorious claims of privilege to adequately serve the ultimate aim of any privilege— unfettered disclosures in particular circumstances.

*Harris*, 612 Pa. at 589, 32 A.3d at 251.

Thus, pursuant to *Harris*, we find Attorney Rominger's first issue, which alleges Judge Cleland erred in ordering improper disclosure in violation of the work-product doctrine, is immediately appealable under the collateral order doctrine.

Thus, we turn to an examination of the merits of Attorney Rominger's first issue.[9] That is, did, in fact, the second

---

**7.** In *Ben*, a plaintiff in a dental malpractice suit subpoenaed the Bureau of Professional and Occupational Affairs to produce its investigative file for the dentist being sued. The Bureau moved to quash the subpoena, asserting that the material subpoenaed was subject to various privileges. The lower court dismissed the motion to quash, and upon review, our Supreme Court concluded the order met the three requirements of Rule 313(b). *Ben, supra.*

**8.** In *Mohawk Industries,* the federal district court ordered Mohawk Industries to disclose certain materials putatively protected by the attorney-client privilege on the ground that Mohawk Industries had waived the privilege. Mohawk Industries appealed and, eventually, the U.S. Supreme Court granted review and held that rulings adverse to the attorney-client privilege are not eligible for collateral order appeals. *See id.*

**9.** The issue of whether disclosure is to be allowed, if protection is to be afforded, and

paragraph of Judge Cleland's June 26, 2012 order improperly direct disclosure of information in violation of the work-product doctrine? [10]

[T]he work-product doctrine provides broader protections than the attorney-client privilege and shields from disclosure an attorney's (or his representative's, [investigator's or other agent's] ) opinions, theories, or conclusions. Pa. R.Crim.P. 573(G).[11] The underlying purpose of the work product doctrine is to guard the mental processes of an attorney, providing a privileged area within which he can analyze and prepare his client's case.

[This Court has] described the work product doctrine as one that promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients ... [and further] protects materials prepared by agents for the attorney.

*Commonwealth v. Hetzel*, 822 A.2d 747, 757 (Pa.Super.2003) (quotation and quotation marks omitted) (footnote in original). See *Commonwealth v. Kennedy*, 583 Pa.

208, 876 A.2d 939 (2005). This Court has recognized the work-product doctrine applies to pre-trial discovery, as well as discovery otherwise during the course of the criminal trial proceedings.[12] See *Commonwealth v. Baumhammers*, 599 Pa. 1, 960 A.2d 59 (2008).

■ In the case *sub judice*, we initially conclude Attorney Rominger cannot invoke the work product doctrine to avoid compliance with the protective order in this limited case. As both the United States Supreme Court and our Pennsylvania Supreme Court have recognized, at the core of the work-product doctrine is the fact "attorneys need a certain degree of privacy, free from unnecessary intrusion by **opposing parties and their counsel.**" *Kennedy*, 583 Pa. at 218, 876 A.2d at 945 (quoting *Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947)) (emphasis added). Moreover, the criminal rules pertaining to protective orders generally permit evidence challenged under the work-product doctrine to be reviewed by the trial court *in camera*, and if protection is given, the evidence is then to be

the form of such protection, are matters to be determined according to the discretion of the trial court, and upon review, we examine the trial court's ruling for an abuse of discretion. *See Harris, supra.*

10. The Commonwealth suggests Attorney Rominger has "no standing" in this matter and cannot assert the work-product doctrine independently on his own behalf. *See* Commonwealth's Brief at 13. In light of our discussion *infra*, we need not address this issue further; however, we note that, in *In re Estate of Wood*, 818 A.2d 568 (Pa.Super.2003), where an attorney who had represented the deceased was ordered to disclose certain reports in estate litigation among the deceased's surviving daughters, we implicitly recognized an attorney is also a holder of the privilege under the work-product doctrine.

11. The Rules provides:

Work Product

[Pre-trial] [d]isclosure shall not be required of legal research or of records, correspondence, reports or memoranda to the extent that they contain the opinions, theories, or conclusions of the attorney for the Commonwealth or the attorney for the defense, or members of their legal staffs.

Pa.R.Crim.P. 573(G).

12. We note Attorney Rominger waived the procedural uniqueness and the timing of the entry of the protective order, which was filed post-trial, but while ongoing grand jury investigations against Gerald Sandusky continued. Moreover, Judge Cleland suggested he was going to utilize the considerations of Pa. R.Crim.P. 573(F) in determining whether to enter a protective order, and in this regard, Attorney Rominger did not object.

sealed and preserved. *See* Pa.R.Crim.P. 573(F).

Here, our review of Judge Cleland's order reveals that the information to be disclosed by Attorney Rominger under paragraph two of the order is to be provided solely "to the Court and to the Supervising Judge of the Grand Jury." The order did not direct the information be provided to the Commonwealth, or anyone else for that matter.[13] We conclude the core purpose of the work-product doctrine is not violated in this case.

■ In any event, assuming that Attorney Rominger was permitted to invoke the privilege under the work-product doctrine to avoid compliance, he has failed to demonstrate how Judge Cleland's order violates the work-product doctrine. Aside from baldly asserting the order would somehow force the defense attorneys to reveal "names of experts, investigators, or other persons consulted," he has failed to develop the argument further. That is, he has not explained how paragraph two of Judge Cleland's order requires disclosure of his "opinions, theories, or conclusions" or otherwise the defense's mental processes or impressions of Gerald Sandusky's case. *See Kennedy, supra; Hetzel, supra;* Pa.R.Crim.P. 573(G). We simply decline to develop this argument for Attorney Rominger or otherwise become his advocate in this regard. *See* Pa.R.A.P. 2119. Thus, we find he is not entitled to relief on his first issue.

■ Attorney Rominger's second issue is, to the extent Judge Cleland's order does not violate the work-product doctrine,

it was "patently unfair" to require the defense attorneys to provide such information without requiring the Commonwealth's attorneys to do so as well.

As with Attorney Rominger's first issue, we have no difficulty concluding Attorney Rominger's second issue is separable from the main cause of action, i.e., whether Gerald Sandusky is guilty of the crimes for which he was convicted. *See Kennedy, supra.* However, even assuming, *arguendo,* Attorney Rominger's second issue involves a right too important to be denied review, we conclude he has failed to demonstrate the issue is such that if review is postponed until final judgment, the claim will be irreparably lost. As this Court noted in a similar case, an appellant's claim the trial court abused its discretion in ordering one party, but not the other, to reveal privileged information is an "error . . . which may be corrected on direct appeal once a final order has been issued. . . . [A]n [appellant] simply does not stand to lose any . . . important right [by requiring immediate disclosure by the other party]." *Pilchesky,* 12 A.3d at 437–38. Thus, we conclude Attorney Rominger is not entitled to collateral review for his second issue.[14]

■ Attorney Rominger's third issue is Judge Cleland misrepresented the record when he suggested in his June 26, 2012 order that the provisions of the order, including paragraph two, was being filed "upon consent of all counsel." That is, Attorney Rominger disputes he should be required to disclose information allegedly

13. We note that, when Attorney Amendola provided the ordered information, he did so, with court permission, under seal. There is no indication from the record that Attorney Rominger would not be permitted to provide such information under seal, as well.

14. As indicated *supra,* in a footnote, Judge Cleland's order directed that "[a]ny reciprocal order" directed to the prosecution would fall within the prerogative of Judge Feudale.

protected by the work-product doctrine on the basis he consented to paragraph two of the order, thus waiving the privilege under the work-product doctrine.[15]

As with Attorney Rominger's previous issues, this issue is separable from the main cause of action, i.e., whether Gerald Sandusky is guilty of the crimes for which he was convicted. *See Kennedy, supra.* Additionally, since the end result of any waiver of the privilege under the work-product doctrine would be the disclosure of information related thereto, as with Attorney Rominger's first issue, we find the issue of whether Judge Cleland allegedly erred in requiring disclosure due to Attorney Rominger consenting to the order, thus waiving the privilege, involves a right too important to be denied review and is such that it will be irreparably lost if review is postponed. *See Harris, supra; Ben, supra.* Therefore, Attorney Rominger is entitled to collateral review of this issue, and we would, normally, proceed to determine whether the trial court erred in finding he consented to the order, thus waiving the work-product doctrine.

However, in this case, since we have already concluded Attorney Rominger is not entitled to relief on his claim of privilege under the work-product doctrine, independent of whether he waived such by consenting to the order, we find it unnecessary to address this issue further. In so finding, we note that Attorney Rominger has not further developed his claim of privilege under the work-product doctrine. *See* Pa.R.A.P. 2119.

For all of the foregoing reasons, we affirm as to Attorney Rominger's first and

**15.** Our Supreme Court has held that "the work-product doctrine is not absolute but, rather, is a qualified privilege that may be

third issues and quash as to his second issue.

Quashed, in part, Affirmed, in part.

waived." *Kennedy,* 583 Pa. at 219, 876 A.2d at 945 (citation and footnote omitted).