18 A.3d 203 (2011)
419 N.J. Super. 584
STATE of New Jersey, Plaintiff-Respondent,
v.
Keith V. PITTMAN, Defendant-Appellant.
No. A-5867-08T4.
Superior Court of New Jersey, Appellate Division.
Submitted February 15, 2011.
Decided May 13, 2011.
*204 Yvonne Smith Segars, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).
Robert D. Bernardi, Burlington County Prosecutor, attorney for respondent (Alexis R. Agre, Assistant Prosecutor, of counsel and on the brief).
Before Judges WEFING, PAYNE and KOBLITZ.
The opinion of the court was delivered by
PAYNE, J.A.D.
Defendant, Keith Pittman, appeals from his conviction for first-degree robbery, N.J.S.A. 2C:15-1, second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2a(1) and 2C:15-1, third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4d, and the lesser-included offence of third-degree aggravated assault, N.J.S.A. 2C:12-1b(7). He was sentenced to a ten-year term of imprisonment, subject to the parole ineligibility provisions of the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. On appeal, he makes the following arguments:
POINT I
THE ADMISSION OF THE RESULTS OF A PHENOLPHTHALEIN TEST OF DEFENDANT'S CLOTHES THAT PURPORTEDLY DETECTED THE PRESENCE OF BLOOD DEPRIVED DEFENDANT OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL WITHOUT EVIDENCE OF THE TEST'S GENERAL ACCEPTANCE IN THE SCIENTIFIC COMMUNITY AND THE METHODOLOGY USED, IN CONJUNCTION WITH THE STATE'S FAILURE TO PRESERVE THE TEST AND THE CLOTHING.
(Not Raised Below.)
POINT II
TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO MOVE FOR EXCLUSION OF THE PHENOLPHTHALEIN TEST RESULTS BECAUSE THE COURT WOULD HAVE RULED THE EVIDENCE INADMISSIBLE PURSUANT TO A TIMELY OBJECTION, AND COUNSEL'S FAILURE COULD NOT BE *205 EXPLAINED BY ANY POSSIBLE REASONABLE TRIAL STRATEGY.
(Not Raised Below.)
POINT III
THE JURY INSTRUCTION ON THE SUBSTANTIVE OFFENSE OF AGGRAVATED ASSAULT FAILED TO TELL THE JURY THAT A NECESSARY PRECURSOR TO CONVICTION WAS PROOF BEYOND A REASONABLE DOUBT THAT THE DEFENDANT DID NOT ACT JUSTIFIABLY IN DEFENSE OF ANOTHER AND THUS DEPRIVED DEFENDANT OF THE RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL.
(Not Raised Below.)
POINT IV
THE STATE COMMITTED PROSECUTORIAL MISCONDUCT IN VOUCHING FOR THE CREDIBILITY [OF] TWO CRUCIAL WITNESSES WHILE SUGGESTING DEFENDANT TAILORED HIS TESTIMONY TO PROVIDE AN INNOCENT EXPLANATION FOR THE EVIDENCE AGAINST HIM; THIS MISCONDUCT DEPRIVED DEFENDANT OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL.
(Not Raised Below.)
POINT V
THE TRIAL WAS SO INFECTED WITH ERROR THAT EVEN IF THE INDIVIDUAL ERRORS, AS SET FORTH ABOVE, DO NOT CONSTITUTE REVERSIBLE ERROR, THE ERRORS IN THE AGGREGATE DENIED DEFENDANT A FAIR TRIAL.
(Not Raised Below.)
POINT VI
THE RESTITUTION ORDER SHOULD BE VACATED BECAUSE IT WAS IMPOSED WITHOUT AN INQUIRY INTO DEFENDANT'S ABILITY TO PAY.

I.
The evidence was sufficient for a jury to find that, on September 29, 2005, near midnight, Scott Kocher left the Playhouse Go-Go Bar in Burlington City and proceeded, while visibly intoxicated, toward his pick-up truck, parked in the bar's parking lot. When near the truck, he was approached by two men, later identified as Dante Gittens and defendant. Gittens asked Kocher for a ride "across the bridge," which Kocher refused to provide. As Kocher attempted to enter his truck, Gittens pinned him against the truck and demanded money. Kocher attempted to flee, but was tackled. A fight ensued, and Kocher was stabbed eight times. Kocher believed that more than one individual participated in the attack.
Kocher was unable to identify either of his assailants. However, an eye witness, John Ashwell, an off-duty corrections officer acting as a chauffeur for customers in the bar, witnessed the assault. When Ashwell approached, yelling at the attackers, they ran off. Ashwell testified at trial that both men were attempting to reach Kocher's wallet, and both were throwing punches. However, he saw only one knife. Ashwell called 9-1-1, and shortly thereafter, the police arrived.
In a subsequent search of the area, the police found defendant lying on his stomach near the house that was next door to that of his grandparents, where he lived. His jacket and blood-stained gloves were found in nearby yards. DNA tests disclosed the blood on the gloves to be that of Gittens and Kocher. Both defendant and Gittens were identified by Ashwell as the perpetrators of the assault and attempted robbery.
*206 In a statement to the police, defendant admitted to participating in a conspiracy to rob and to possession of a knife. Both admissions were denied at trial. Rather, defendant testified that, on the evening of the robbery, he had walked to a nearby bar, Club Risque, to play pool. There, he met up with Gittens. As the evening progressed, Gittens gave his last twenty dollars to a woman in return for a lap dance, but when the music did not last as long as he expected, he became aggravated and knocked something off the bar's counter. Gittens was asked to leave, and defendant followed shortly thereafter.
As the two men walked toward the Playhouse parking lot, Gittens complained that he did not have money to get home. Defendant could not offer Gittens a bed at his grandparents' house and, because he did not have his bank card, he was unable to offer him cash. Gittens proposed robbery. As the two men crossed the Playhouse parking lot, they observed Kocher, and Gittens asked him for a ride. Defendant determined to leave, and as he did, he heard "some racket." He turned, and observed Kocher attacking Gittens. Because Kocher was assaulting defendant's friend, defendant ran back to try to break up the fight. Eventually, defendant shoved Kocher, causing him to fall, and defendant and Gittens ran. As defendant approached the road where he lived, defendant was spotted by the police, who gave chase and eventually apprehended him in the neighbor's yard.
Although defendant admitted in his statement to the police that he had a knife, at trial he testified that he had left the knife at his grandparents' house, where it remained either in the sink or the dishwasher. At trial, defendant said he did not know whether Gittens had a knife, although he had told the police that Gittens possessed one that night.
The jury did not accept defendant's version of the events, finding him guilty as we have specified.

II.
At trial, Burlington City Detective James Barnes, a twenty-three year veteran of the city police force, testified that, at police headquarters, he tested defendant's clothes for the presence of blood using a phenolphthalein test, and that the result was positive. When asked to explain the phenolphthalein test to the jury, Barnes responded:
It's a test that's used to determine whether there's blood on clothes. It's a very simple test. It'syou just like pat and it comes back positive for blood.
When asked to describe how the test is performed, Barnes stated:
It's like a swab, a little swab. And you put it in your hand and you would touch the areas where you think blood is at, and it comes back positive. It'sfor lack of a better word, it's idiot-proof. It'syou read the directions on the box. That's how you follow it.
Barnes testified further that the swab turned pink to indicate a positive result, whereas the swab was otherwise white. The test, he stated, was designed to detect blood, not just human blood.
Barnes testified that this was the first occasion on which he had used the test, and that he did so after defendant denied being present at the scene of the assault and attempted robbery. After a positive result was obtained, Barnes informed the sergeant who was interrogating defendant. The sergeant responded that the police should take defendant's clothes. However, no one did so, because no replacement clothes were available for defendant's use and the police "[c]ouldn't send him to jail naked." Additionally, the police *207 did not retain the positive swab, but instead, Barnes threw it away as used up. As a consequence, no confirmatory testing was performed.
On cross-examination, Barnes testified that he did not know the accuracy of the test, or whether it could also give a positive result when tested on tomatoes, potatoes, cucumbers, horseradish, fruit extracts, some metallic substances, or peroxide-like substances. Barnes testified further that he was not certain how the test worked, and when asked whether he knew the chemical basis for the test, Barnes responded: "If I knew that I wouldn't be a detective." According to Barnes, his department, as a matter of routine, performs no further confirmatory tests to determine whether or not a clothing stain is actually blood.
On appeal, defendant claims that the judge committed plain error in permitting the introduction of evidence of the phenolphthalein test result without establishing its reliability, preserving the test swab and the sampled clothing for confirmatory testing, and establishing that the testing method used by Barnes was correct. Defendant further contends that the error was not harmless, because evidence of blood on defendant's clothes supported the State's theory that defendant was an active participant in the assault and attempted robbery, and cast doubt on defendant's claim that he was a nonparticipant in the alleged criminal conduct, and intervened in the fight between Kocher and Gittens only to protect his friend.
The State admits that "New Jersey case law is silent as to the reliability of the phenolphthalein test for the presence of blood."[1] However, it argues that other jurisdictions have determined that the test, which is presumptive only, can be admitted, with the presumptive nature of the result affecting only the weight of the evidence, and it argues erroneously that the Supreme Court of Washington has found the results of the phenolphthalein test reliable under state evidence rules and Frye v. United States, 293 F. 1013 (D.C.Cir. 1923). See State v. Stenson, 132 Wash.2d 668, 940 P.2d 1239 (1997),[2]cert. denied, 523 U.S. 1008, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998). Turning to the matter on appeal, the State argues that any foundational deficiencies in the introduction of the scientific evidence in this case were cured by defense counsel's effective cross-examination of Detective Barnes. Further, the State contends that the test for the presence of blood played only a minor role in the case against defendant, and thus its admission did not constitute plain error.
We do not agree with the State's position that the results of the phenolphthalein test as offered by Barnes were admissible. As described by the Office of Forensic Science of the New Jersey State Police, the phenolphthalein test, also known as the Kastle-Meyer (KM) test
is a presumptive test for blood. Three reagents (ethanol, KM reagent [phenolphthalin], *208 and hydrogen peroxide) are applied, in turn, to the suspected bloodstain. If blood is present, a pink color change will occur within seconds. This is not a conclusive test, however, as other materials could give a false positive result.[3]
See also R.E. Gaensslen, Sourcebook in Forensic Serology, Immunology, and Biochemistry at 103-05 (National Institute of Justice, U.S. Department of Justice, 1989 ed.) (detailing the history of the test).[4]
Without doubt, the phenolphthalein test conducted on defendant's clothing in this case was a "scientific test." In State v. Chun, 194 N.J. 54, 943 A.2d 114, cert. denied, ___ U.S. ___, 129 S.Ct. 158, 172 L.Ed.2d 41 (2008), the Court summarized the principles of law governing admissibility of scientific test results in criminal trials, stating:
Admissibility of scientific test results in a criminal trial is permitted only when those tests are shown to be generally accepted, within the relevant scientific community, to be reliable. See State v. Harvey, 151 N.J. 117, 169-70 [699 A.2d 596] (1997) (citing Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923)); Romano [v. Kimmelman], 96 N.J. [66,] 80 [474 A.2d 1 (1984)]; [State v.] Johnson, 42 N.J. [146], 170-71 [199 A.2d 809 (1964)]. That is to say, the test must have a "sufficient scientific basis to produce uniform and reasonably reliable results and will contribute materially to the ascertainment of the truth." State v. Hurd, 86 N.J. 525, 536 [432 A.2d 86] (1981) (quoting State v. Cary, 49 N.J. 343, 352 [230 A.2d 384] (1967)). . . .
Proof of general acceptance does not mean that there must be complete agreement in the scientific community about the techniques, methodology, or procedures that underlie the scientific evidence. See Romano, supra, 96 N.J. at 80 [474 A.2d 1]. . . . Neither "complete agreement over the accuracy of the test [nor] the exclusion of the possibility of error" is required. Harvey, supra, 151 N.J. at 171 [699 A.2d 596].
Nevertheless, before we can conclude that scientific test results are admissible in evidence, the proponent of the scientific device must bear its burden to "clearly establish" that the device or the test meets the standard of general acceptance as we have defined it. Id. at 170 [699 A.2d 596]; see State v. Kelly, 97 N.J. 178, 209-11 [478 A.2d 364] (1984); State v. Cavallo, 88 N.J. 508, 521 [443 A.2d 1020] (1982).
[Chun, supra, 194 N.J. at 91-92, 943 A.2d 114.]
In the present case, there was no evidence presented that the phenolphthalein test utilized by Detective Barnes was generally accepted in the scientific community to be reliable. The prosecutor offered no expert testimony on the issue of general acceptance and thus the reliability of the evidence, and defendant did not stipulate to that fact. As the Court stated in State v. Kelly, 97 N.J. 178, 478 A.2d 364 (1984), "there are three ways a proponent of scientific evidence can prove . . . general acceptance and thereby . . . reliability: (1) by expert testimony as to the general acceptance, among those in the profession, of the premises on which the proffered expert witness based his or her analysis; (2) by authoritative scientific and legal writings indicating that the scientific community accepts the premises underlying the *209 proffered testimony; and (3) by judicial opinions that indicate the expert's premises have gained general acceptance." Id. at 210, 478 A.2d 364 (citing State v. Cavallo, 88 N.J. 508, 521, 443 A.2d 1020 (1982)). None of these methods was used in this case. Further, the testimony of Barnes himself, a lay witness, did not establish reliability.
We note, as did the State, that the results of phenolphthalein tests have been recognized by courts of other jurisdictions as admissible, presumptive evidence of the presence of blood, and that in those cases, the presumptive nature of the test has been found to affect the weight, not the admissibility of the evidence. See, e.g., Stenson, supra, 940 P.2d at 1263 (collecting cases); see also State v. Taylor, 298 S.W.3d 482 (Mo.2009), cert. denied, ___ U.S. ___, 130 S.Ct. 3323, 176 L.Ed.2d 1226 (2010); Wilkes v. State, 917 N.E.2d 675 (Ind.2009), cert. denied, ___ U.S. ___, 131 S.Ct. 414, 178 L.Ed.2d 321 (2010); Commonwealth v. Hetzel, 822 A.2d 747 (Pa.Super.), appeal denied, 576 Pa. 711, 839 A.2d 351 (2003). Contra see Young v. State, 316 Ark. 225, 871 S.W.2d 373 (1994) (luminol test for blood); State v. Moody, 214 Conn. 616, 573 A.2d 716 (1990) (unspecified presumptive test for blood). See also Amy P. Bunk and Guy A. Talia, Admissibility of Results of Presumptive Tests Indicating Presence of Blood on Object, 82 A.L.R.5th 67 (2000). However, even if we were to accept the decisions finding the results of phenolphthalein tests to be sufficiently reliable to warrant admission into evidence as dispositive of that issue, the conditions for admissibility recognized in them would not be met here.
In those cases that have recognized the admissibility of the test results as presumptive evidence of the presence of blood without further confirmatory testing, the limitations of the test and the possibility of false positive results have been fully explained to the jury. In that regard, juries have been informed that the phenolphthalein test can, in addition to manifesting a reaction to blood, give a positive reaction to potatoes, rust, bleach, and nickel, Taylor, supra, 298 S.W.3d at 500; that the presence of a vegetable substance, such as red beets can create a false positive, Hetzel, supra, 822 A.2d at 761; and that "a host of environmental materials having nothing to do with blood can trigger a positive reaction." Stenson, supra, 940 P.2d at 1264. See also Sourcebook in Forensic Serology, supra, at 103 (noting that saliva, pus, malt extract, vegetable extracts and the salts of heavy metals could give false positive results). In all such decisions, the admissibility of the presumptive evidence was expressly conditioned on the existence of expert testimony as to the possibility of a false positive.
In contrast, in the present case, defense counsel asked Barnes on cross-examination if he knew whether the phenolphthalein test was 100 percent accurate, and Barnes responded that he did not know. Barnes was also unable to confirm one way or another whether contact with enumerated substances other than blood could result in a false positive. Thus, the testimony found crucial in cases permitting the introduction of evidence of the results of a non-confirmed phenolphthalein test was not offered here. Rather, the jury was left with the clear impression that the test was conclusive, not presumptive.
Further, we recognize that other courts have observed that "performing the test improperly could cause a false positive." Hetzel, supra, 822 A.2d at 761. No expert established at the trial of the present matter the manner in which the phenolphthalein test should be performed, concluded that the test performed by Barnes had, in fact, been done as directed, or established *210 what the consequences would have been if improperly conducted.
As a consequence of the foregoing, we conclude that the introduction into evidence of the result of the phenolphthalein test was erroneous. Contrary to the State's position, we are satisfied that the error was clearly capable of producing an unjust result, Rule 2:10-2, and could have "led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971). As we previously recounted, the independent witness, Ashwell, testified that both defendant and Gittens participated in the assault on Kocher. In contrast, defendant testified that his involvement was limited to pushing Kocher to the ground and extricating his friend. The presence of blood on defendant's gloves would be consistent with defendant's version of events, since he would have used his hands in breaking up the fight. The presence of blood on his clothing suggests a greater involvement in the affray on defendant's part. Thus, evidence confirming the existence of blood on defendant's clothing substantially undercut the weight of defendant's testimony, thereby increasing the credibility of Ashwell's contrary version of what had occurred. In these circumstances, we conclude that a new trial is required.

III.
In light of the foregoing, we decline to consider defendant's additional arguments, except to note that the defense of use of force in the protection of others was not available to defendant, and therefore he was not entitled to a jury instruction on that defense. Because, even under defendant's view of the events, he understood that Gittens intended to rob Kocher, it cannot be said that defendant "reasonably believed both that the person he sought to aid was unlawfully attacked and that the force used was necessary to protect that person from the attack." State v. Bryant, 288 N.J.Super. 27, 35, 671 A.2d 1058 (App. Div.), certif. denied, 144 N.J. 589, 677 A.2d 761 (1996) (citing State v. Martinez, 229 N.J.Super. 593, 600, 552 A.2d 232 (App. Div.1989)); see also State v. Josephs, 174 N.J. 44, 102, 803 A.2d 1074 (2002).
Reversed.
NOTES
[1] Results obtained by the use of presumptive tests for the presence of blood are mentioned in State v. Williams, 404 N.J.Super. 147, 159, 960 A.2d 805 (App.Div.2008) (unspecified test), certif. denied, 201 N.J. 440, 991 A.2d 229 (2010) and State v. Urcinoli, 321 N.J.Super. 519, 529-30, 729 A.2d 507 (App.Div.) (luminol test), certif. denied, 162 N.J. 132, 741 A.2d 99 (1999). However, introduction of the evidence was not challenged in either case.
[2] The defendant did not contest the fact that the phenolphthalein test met Frye's standards for admissibility. Id. at 1263. However, in State v. Taylor, 298 S.W.3d 482 (Mo.2009), cert. denied, ___ U.S. ___, 130 S.Ct. 3323, 176 L.Ed.2d 1226 (2010), the trial court conducted a hearing pursuant to Frye and found the test admissible, a determination that was affirmed on appeal.
[3] This description is taken from the State Police website, and can be accessed at http:// www.state.nj.us/njsp/divorg/invest/ criminalistics.html.
[4] This material can be accessed at http:// www.ncjrs.gov/pdffiles1/pr/16088_unit_2.pdf.