

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-23-00777-CR

Joel David **CHAVEZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 111th Judicial District Court, Webb County, Texas
Trial Court No. 2022-CRA-001335-D2
Honorable Monica Z. Notzon, Judge Presiding

Opinion by: Beth Watkins, Justice

Sitting: Irene Rios, Justice
Beth Watkins, Justice
Lori I. Valenzuela, Justice

Delivered and Filed: December 18, 2024

AFFIRMED

A jury convicted appellant Joel David Chavez of capital murder for causing the deaths of

Graciela Alexandra Espinoza and her unborn child. On appeal, he argues: (1) the evidence is

insufficient; (2) the trial court erred in overruling his motion to suppress; and (3) the trial court

erred in admitting testimony about presumptive blood on gloves found inside Chavez's bedroom

at his parents' house. We affirm.

## BACKGROUND

On the morning of September 10, 2020, a construction crew with the City of Laredo found a body at Albert Ochoa Park and called police. The body had injuries consistent with having been dragged across the ground and was covered with a Nixon High School letterman jacket. Responding officers noted a trail of blood leading to the body.

The body was later identified as Graciela "Gracie" Alexandra Espinoza. The park where Gracie's body was found was only a block from the Frost Street apartment she and her boyfriend, Chavez, had moved into a few days prior. The medical examiner concluded that the cause of death was "asphyxiation due to manual strangulation" and the manner of death was homicide. Gracie was 9-10 weeks pregnant when she died.

The night before Gracie's body was found, she and her younger siblings were at the Frost Street apartment. Chavez biked to the apartment from his job at H.E.B. and arrived around 10:30 p.m. Gracie asked him to order an Uber to take her siblings to the home of their mother, Myra Rivera, a few miles away. Though it was late and raining, he refused. Gracie started to walk her siblings home. Once they reached the park, Gracie contacted her friend Ryan Christopher Mendiola to ask for a ride. Mendiola agreed and drove them to Rivera's house. Gracie dropped off her siblings, left her phone with her sister Maria, and left her mother's home with Mendiola.

Gracie told Mendiola she left her phone behind because Chavez used it to track her locations. Chavez immediately started calling and texting Gracie's phone, and Maria contacted Gracie through Mendiola's Snapchat account to let her know; Gracie told Maria not to answer the calls, but to respond to Chavez's messages as if she were Gracie. Gracie told Maria to say that she was talking to their older brothers, that her brothers would not let her leave the house, that her brothers would be "outside waiting for him" if he came over, and that he was not welcome in the

house. Mendiola took Gracie to the Cactus Motel, and they rented a room for an hour. Mendiola and Gracie ultimately had sex. Afterwards, Mendiola's "Snapchat was still going off from [Gracie's] sister messaging her." "Gracie was in a panic wanting to get back [to Rivera's] home to get her phone."

Mendiola drove Gracie to Rivera's house to retrieve her phone. Around 1:15 a.m., he dropped Gracie off near—but not in front of—her Frost Street apartment.

Around 1:00 a.m., Jaden Lopez walked outside his house on Frost Street with a friend. He and the friend spoke outside before the friend drove away around 1:20 a.m. When the friend started the car, the headlights illuminated "a girl" wearing a Nixon letterman jacket walking from the Albert Ochoa Park area. Lopez also saw "a guy waiting for her towards the apartments in front of" his house "dressed in all black." Once the girl "met up" with the guy, Lopez could tell they were arguing before he walked back to his house.

Around 1:20 a.m., Gracie and Chavez's next-door neighbor, Eliberto Garcia, heard a "racket, noise" coming from Gracie and Chavez's apartment. Garcia overheard someone ask, "Where have you been?" in what Garcia described as a dramatic voice. He heard two voices arguing in Spanish for "40-45 minutes." Garcia heard "a thump" and then it "got very quiet" and he could hear only mumbling. When Garcia was interviewed by police, he reported that the thump sounded like a bicycle hitting the wall and that at 2:30 a.m., he heard—but did not see—Gracie leave the apartment.

The next morning, Rivera went to the Frost Street apartment looking for her daughter. Chavez told her that Gracie was not there, that he had caught her texting another man, and that she had left without her phone. Rivera thought Chavez had been crying. Rivera saw the police presence

at the park, approached officers, learned a body had been found, provided a description of her daughter, and gave officers Chavez's phone number.

Shortly after Rivera left the apartment, Chavez placed a call asking his father to drive him to work. His father is a retired Laredo Police Department Lieutenant, and when he went to his son's apartment, he observed "the police presence in the area." Later that day, when Investigator Raimundo Garcia called Chavez's phone, Chavez's father answered. Investigator Garcia asked that Chavez come to the station for an interview. Chavez's father took him to the station around 1:00 p.m.

Investigator Logan O'Brien spoke with Chavez's father at the station and requested consent to search his house. Chavez's father signed a consent form authorizing the search. O'Brien followed Chavez's father back to his house. O'Brien asked which "room [Chavez] stayed at" and was "led down the hall and shown the room." O'Brien noticed that the room was bare, containing a "mattress, memorabilia, and a backpack." Chavez's father identified the backpack as belonging to Chavez. Forensics Investigator Daniel Meza photographed and seized the backpack. Meza opened the backpack for "inventory purposes." He photographed the contents, which included, inter alia, black clothing and—inside three other plastic bags—a pair of red rubber gloves.

Meanwhile, officers held Chavez for eight hours. He made statements acknowledging that he and Gracie had argued about Mendiola, that she had left in the middle of the night, and that he did not let her take her phone. After officers told him that Gracie was dead, he denied killing her. At the end of the interrogation, Chavez left with his father. One year later, officers arrested Chavez on two charges of murder. He was subsequently reindicted for capital murder.

At trial, the State presented forensic evidence tying "presumptive blood" found on the outside of the gloves to Gracie, and genetic material recovered from swabbing the inside of the

gloves to Chavez. The State played Chavez's stationhouse interview. It also played surveillance video and introduced related testimony from a woman who walked past Nixon High School[1] at 3:56 a.m. and did not hear an argument or a struggle or see a body.

The State also introduced contentious text messages between Chavez and Gracie. In one message, Gracie confronted Chavez about making a report about her family with Child Protective Services on August 25, 2020. The day prior, Gracie and Chavez had argued at Rivera's house, Gracie locked herself inside her bedroom, and Chavez was outside the home. As he tried to open her window to speak to her, Gracie slammed the windowpane on Chavez's hand. Both Gracie and Chavez called the police.

Gracie's best friend, Joiza Contreras, testified that she had been very concerned for her friend—Chavez was jealous, constantly tracked Gracie's movements, and was "very controlling." Contreras saw Chavez grab Gracie by her neck and saw bruises on her arms and thighs. Contreras told Gracie to leave Chavez, even though she knew Gracie was pregnant and Chavez was the father. Contreras described Gracie as "depressed, I guess. She would just be laying down, sleeping, and crying. She wouldn't eat as much. You could see that she was losing it."

The State presented evidence to show how it eliminated as suspects both Mendiola, who had Gracie's DNA under his fingernails, and another man, Ivan Estrada, who confessed to the crime on social media "as a joke."

At trial, Chavez developed the theory that Mendiola had killed Gracie. He argued that Mendiola had sex with Gracie the night she died, that he was the last person to see her alive, and that he "literally, dropped her off at the very place where she was found dead." Chavez argued Mendiola "failed the polygraph" when he was asked if he was responsible for Gracie's death. He

---

[1] A witness testified that Albert Ochoa Park where Gracie's body was found is "close to the Nixon High School."

relied on evidence that Mendiola could not be excluded as a donor of semen and DNA recovered from vaginal and anal swabs of Gracie's body. Chavez argued the lack of blood and DNA evidence from the apartment established that Gracie was not killed there. He pointed to the evidence that the medical examiner testified that the body was discovered at 9:00 a.m. and that rigor mortis had set in, meaning that Gracie had been dead since before 3:00 a.m.—a time when Chavez was active on his phone. He argued that officers failed to follow up on other evidence.

The jury convicted Chavez and the trial court imposed an automatic sentence for capital murder of life without parole. He appeals.

## ANALYSIS

### *Sufficiency*

In his second issue, Chavez argues the evidence was insufficient to support his conviction because: (1) the State's witnesses lacked credibility; and (2) the evidence pointed to Mendiola "and only" Mendiola. Because this issue would, if meritorious, require us to render a judgment of acquittal, we consider it first. *See, e.g.*, *Owens v. State*, 135 S.W.3d 302, 305 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

### *Applicable Law and Standard of Review*

We review a challenge to the sufficiency of the evidence under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). Under that standard, we examine all the evidence in the light most favorable to the verdict and resolve all reasonable inferences from the evidence in the verdict's favor to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Nowlin v. State*, 473 S.W.3d 312, 317 (Tex. Crim. App. 2015). "[N]o evidence is ignored because the standard requires a reviewing court to view all of the evidence in

the light most favorable to the verdict." *Cary v. State*, 507 S.W.3d 750, 759 n.8 (Tex. Crim. App. 2016) (internal quotation marks and emphasis omitted). "An appellate court cannot act as a thirteenth juror and make its own assessment of the evidence." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018). Rather, "[a] court's role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Id*. This rationality requirement is a key and explicit component of the Jackson sufficiency standard. *See Jackson*, 443 U.S. at 319.

A person commits capital murder "if the person commits murder as defined under Section 19.02(b)(1)" and "the person murders more than one person . . . during the same criminal transaction[.]" TEX. PENAL CODE ANN. § 19.03(a)(7)(A). Under Section 19.02(b)(1), a person commits murder "if the person . . . intentionally or knowingly causes the death of an individual[.]" TEX. PENAL CODE ANN. § 19.02(b)(1). The Penal Code's definition of "person" includes "an individual." TEX. PENAL CODE ANN. § 1.07(a)(38). And the term "individual" is defined by statute as "a human being who is alive, including an unborn child at every stage of gestation from fertilization until birth." TEX. PENAL CODE ANN. § 1.07(a)(26).

*Application*

When viewed in the light most favorable to the judgment, the evidence shows:

- Chavez was known to be physically aggressive with Gracie, to track her every movement, and to be extremely jealous of any friendships she had with other men; *See* TEX. CODE CRIM. PROC. ANN. art. 38.36(a) ("In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.");

- Chavez was especially jealous of Gracie's past relationships with Mendiola and one other man, even though that man had committed suicide;

- Gracie also tracked Chavez and tried to avoid him when she saw him coming towards her;

- A few weeks before Gracie was killed, she smashed Chavez's fingers in a window and called the police;

- Gracie and Chavez argued extensively the night before she was killed;

- Phone records contradict Chavez's statement to officers that he was asleep at the likely time of the murder because both his and Gracie's phones were being locked and unlocked and captured other actions during that time;

- Officers found the pair of triple-wrapped gloves in Chavez's backpack that contained a presumptive blood stain tied to Gracie; the stain contained a single-source DNA profile consistent with female blood and Gracie could not be excluded as the donor in a "very discriminating profile"; *See*, *e*.*g*., *Lozano v. State*, 359 S.W.3d 790, 814 (Tex. App.—Fort Worth 2012, pet. ref'd) (attempts to conceal incriminating evidence probative of wrongful conduct and are circumstances of guilt);

- Chavez could not be excluded as the donor to a mixture found on the inside of the gloves; *See*, *e*.*g*., *Segundo v. State*, 270 S.W.3d 79, 89 (Tex. Crim. App. 2008) (DNA evidence is "highly probative" of identity);

- The clothes found in Chavez's backpack matched Lopez's description of the man "dressed in all black"; *See Turner v. State*, 414 S.W.3d 791, 798 (Tex. App.—Houston [1st Dist.] 2013), *aff'd as modified*, 443 S.W.3d 128 (2014); and

- Chavez knew Gracie was pregnant, and the medical examiner testified that when Gracie was killed, the "9-to-10 week fetus in her uterus" was also killed; *See Estrada v. State*, 313 S.W.3d 274, 305 (Tex. Crim. App. 2010).

On appeal, Chavez focuses on the theory he raised at trial that Mendiola killed Gracie. The jury heard evidence that Mendiola had sex with Gracie the night of her murder, dropped her off near the park where her body was found, and his answer to one question on his polygraph exam— "Do you feel responsible for Gracie's death?"—was found to be deceptive. But the jury also heard Mendiola testify that he "[a]bsolutely" did not murder Gracie. He testified that, after dropping Gracie off near the apartment, he was hungry so he "went over to McDonald's," and then "straight home" where he disarmed the alarm system at around 1:30 to 1:40 a.m. This testimony was corroborated by video of him going through the drive through at McDonald's and alarm panel records Mendiola pulled up on his phone. Additionally, the evidence showed Mendiola cooperated

with the police during the investigation by making a statement, allowing officers to examine his phone and shoes, and giving consent for a DNA collection and a search of his room. He testified that Gracie's DNA was under his nails "[p]robably from our sex that night." Finally, he became emotional during his testimony because he thought Gracie might still be alive if he had not had sex with her that night.

It was up to the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts," *Jackson*, 443 U.S. at 319, including Mendiola's innocent explanation for the DNA evidence tying him to Gracie and Gracie to him. *C.f. Skinner v. State*, 665 S.W.3d 1, 18 (Tex. Crim. App. 2022). We presume the jury resolved any conflicts that existed in favor of the manner the jury voted to reach its unanimous verdict. *Jackson*, 443 U.S. at 326. After examining all the evidence in the light most favorable to the verdict and resolving all reasonable inferences from the evidence in the verdict's favor, we determine a rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt and, as a result, could have found Chavez guilty of capital murder. *Matlock*, 392 S.W.3d at 667; *Nowlin*, 473 S.W.3d at 317. We therefore overrule Chavez's second issue.

*Application*

### Denial of Motion to Suppress

In his first issue, Chavez argues the trial court erred in admitting the contents of the backpack taken from his bedroom at his parents' home because: (1) he had a legitimate expectation of privacy in the bedroom and backpack; and (2) the officer lacked effective consent to search the bedroom and backpack.

*Standard of Review*

"In reviewing a motion to suppress, we apply a bifurcated standard of review." *State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017). Although we defer to the trial court's factual findings and view them in the light most favorable to the prevailing party, we review the legal issues of standing and the question of whether a specific search or seizure is "reasonable" under the Fourth Amendment de novo. *Kothe v. State*, 152 S.W.3d 54, 59, 62–63 (Tex. Crim. App. 2004).

*Chavez Preserved—and Did Not Forfeit—Error*

Initially, we address the State's argument that Chavez either failed to preserve this issue by failing to obtain an adverse ruling or affirmatively forfeited it by stating "no objection" when the evidence was offered. First, Chavez preserved error: he filed a pretrial motion to suppress, developed testimony at a hearing, and secured an appealable adverse ruling. "[N]othing more is necessary to permit [him] to raise that adverse ruling on direct appeal." *Thomas v. State*, 408 S.W.3d 877, 883–84 (Tex. Crim. App. 2013). Second, Chavez did not forfeit error: the record demonstrates that he "did not intend, nor did the trial court construe, his 'no objection' statement to constitute an abandonment" of his earlier preserved claim. *Id*. at 877. Rather, at a bench conference in the middle of trial, Chavez renewed the objection to the ruling and asked the trial court "to reconsider its ruling on the motion to suppress." The trial court stated, "It's overruled and denied for the record." We therefore conclude that Chavez's claim is properly before us. *See* Tex. R. App. P. 33.1.

*Chavez Had Standing*

Chavez argues the fact that he had moved to his own apartment did not defeat his standing to contest the search of his bedroom in his parents' home and the backpack in it, noting, "If the father recognizes and honors [Chavez's] privacy in his room and backpacks in his room, the police

should also." We hold that Chavez satisfied his burden of demonstrating a legitimate expectation of privacy in his bedroom at his parents' home and his backpack stored there.

Standing is an individual's right to complain about an allegedly illegal governmental search, and thus to exclude evidence. *See Rakas v. Illinois*, 439 U.S. 128, 141–42 (1978)*.* As a result, only defendants who have standing can benefit from the exclusionary rule's protections. *See id*. To have standing, a person must show he personally had a reasonable expectation of privacy. *Id*. at 148–49; *Kothe*, 152 S.W.3d at 59. A legitimate expectation of privacy has both objective and subjective components. *State v. Granville*, 423 S.W.3d 399, 406–07 (Tex. Crim. App. 2014). For the subjective component, the defendant must exhibit an expectation of privacy in the place or item searched. *Id*. at 407. For the objective component, that expectation must be one that society is prepared to recognize as reasonable. *Id*. "Several factors are relevant to determining whether a given claim of privacy is objectively reasonable: (1) whether the accused had a property or possessory interest in the place invaded; (2) whether he was legitimately in the place invaded; (3) whether he had complete dominion or control and the right to exclude others; (4) whether, prior to the intrusion, he took normal precautions customarily taken by those seeking privacy; (5) whether he put the place to some private use; and (6) whether his claim of privacy is consistent with historical notions of privacy." *Granados v. State*, 85 S.W.3d 217, 223 (Tex. Crim. App. 2002). "This list of factors is not exhaustive, however, and none is dispositive of a particular assertion of privacy; rather, we examine the circumstances surrounding the search in their totality." *Id*.

Chavez presented evidence on several factors at the motion to suppress hearing. He testified that at the time of the search, he had recently moved out of his parents' house and into the

Frost Street apartment. He testified that on September 10, 2020, he "was living at both places." He also testified:

- he had a key to his parents' house;

- he had "privacy" in his bedroom there;

- his parents "would not enter" his room and they "never" looked through the items in his room;

- he "would come and go as [he] pleased" and could "invite" and "exclude" people from the house;

- he "was always welcomed" regardless of whether his parents were there;

- he stored belongings in the room including the backpack and jackets;

- he chose his own decoration for the room;

- the durations of his stays in the house "varied. Sometimes [he] would just go to eat, and sometimes [he] would stay over. [He] would stay over, cook for [him]self, and [he] had [his] own room where [he] would stay, and that was [his] established room";

- he intended to spend the night there on September 10, which is why he brought his backpack.

Chavez denied that his father had kicked him out and testified that he was at the police station when the search took place.

The State called Chavez's father. As related to standing, Chavez's father testified:

- he told O'Brien that the room belonged to his son;

- Chavez had moved out but left clothes there;

- Chavez was always welcome and "he had like an open door";

- he never went in Chavez's room.

This demonstrated that Chavez's expectation of privacy was objectively reasonable. Both Chavez and his father testified that Chavez had a "possessory interest" in the place invaded. *See*

*Granados*, 85 S.W.3d at 223; *King v. State*, 670 S.W.3d 653, 655 (Tex. Crim. App. 2023), *cert. denied*, 144 S. Ct. 386 (2023). That testimony also showed Chavez put the room to a "private use." *See Granados*, 85 S.W.3d at 223; *State v. Betts*, 397 S.W.3d 198, 203–04 (Tex. Crim. App. 2013) (former residents who continue, with homeowner's blessing, to put some part of residence to "private use" have legitimate expectation of privacy in host's home); *see also Minnesota v. Olson*, 495 U.S. 91, 98–100 (1990).

As for Chavez's claim of privacy in his backpack, that assertion "is consistent with historical notions of privacy." *See Granados*, 85 S.W.3d at 223. The Supreme Court has held that "luggage is intended as a repository of personal effects." *United States v. Chadwick*, 433 U.S. 1, 13 (1977). "A general expectation of privacy in a purse or backpack is reasonable because such baggage is intended as a repository of personal effects." *Wilson v. State*, 99 S.W.3d 767, 770 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd); *Stone v. State*, 147 S.W.3d 657, 659 (Tex. App.—Amarillo 2004, pet. ref'd). Accordingly, we hold Chavez had an independent reasonable expectation of privacy in his backpack.

We recognize that the trial court did not have to believe certain aspects of Chavez's or his father's testimony. *See Kothe*, 152 S.W.3d at 59; *Williams v. State*, 502 S.W.3d 254, 258 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). The State intimated at trial that Chavez's father had kicked Chavez out of the house and that he had shared that information with the officers. *See Granados*, 85 S.W.3d at 225 (defendant who seeks to challenge search "must establish that he had permission to be on the premises on the occasion of the search"). The State did not, however, present that evidence at the hearing on the motion to suppress. And some facts were undisputed: Chavez had lived at his parents' house until two weeks before the search, some of his belongings

were in the room, he was a welcome guest of his parents on the morning of the search, and the backpack was his.

We conclude that Chavez had a legitimate expectation of privacy in the bedroom and in the backpack he left there, and that society is prepared to recognize that expectation of privacy as reasonable. *King,* 670 S.W.3d at 656–57. We therefore consider the substance of his complaint.

*Chavez's Father's Consent to Search Was Effective*

Chavez argues his father "did not knowingly grant consent to [Chavez's] bedroom and ultimately his backpack and its contents," because the officers led his father "to believe that consent was obtained from his son." He further argues the "police coordinated the events so the search and request for consent would occur while [he] was held in the interview room" to avoid asking for his consent to search.

"The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures." *Limon v. State*, 340 S.W.3d 753, 756 (Tex. Crim. App. 2011). "The entry into a residence by police officers is a 'search' for purposes of the Fourth Amendment." *Id*. "A warrantless police entry into a residence is presumed unreasonable unless the entry falls within one of a well-defined group of exceptions." *Id*. "Voluntary consent is one such exception." *Id*.

Generally, a co-occupant assumes the risk that another co-occupant will consent to a search. *United States v. Matlock*, 415 U.S. 164, 169–71 (1974). However, "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Georgia v. Randolph*, 547 U.S. 103, 122–23 (2006). These rules, "one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it,"

are complementary. *Id*. at 121–22. They apply unless police removed the potential objection and that removal "is not objectively reasonable." *Fernandez v. California*, 571 U.S. 292, 302 (2014).

We find the officers acted reasonably under the consent exception to the warrant requirement. First, Chavez's father consented to the search of the entire home in writing without indicating any exclusions, and he had at least apparent authority to do so. *Rodriguez*, 521 S.W.3d at 19 (apparent authority exists if "the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises") (internal quotation marks omitted); *see also Limon*, 340 S.W.3d at 756–59. Chavez assumed the risk that his father would consent to a search. *Matlock*, 415 U.S. at 169–71. He was not physically present to dispute that consent. *Randolph*, 547 U.S. at 122–23. And his removal—his acquiescence to the officers' request that he make a statement—was not objectively unreasonable. *Fernandez*, 571 U.S. at 302. Officers had reasonable grounds for requesting that Chavez come to the station for questioning—his pregnant girlfriend had been murdered the night before and her body was found near the apartment they shared. Therefore, regardless of the officers' subjective intent in requesting Chavez's presence at the police station, the rule recognizing his father's permission applies. *Id*. at 303 ("[A]n occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason.").

Second, Chavez's father's subjective "assumption that [O'Brien] was already talking to other case Detective, Raimundo Garcia, at the station that he already had consent to get -- to go inside the room, and get the -- seize the bag," does not control. The absence of information that might be relevant to a person's decision to consent does not "automatically render" that decision "involuntary." *See Johnson v. State*, 68 S.W.3d 644, 653 (Tex. Crim. App. 2002). Rather, "courts review the totality of the circumstances of a particular police-citizen interaction from the point of

view of the objectively reasonable person, without regard for the subjective thoughts or intents of either the officer or the citizen." *Meekins v. State*, 340 S.W.3d 454, 459 (Tex. Crim. App. 2011).

We note that Chavez's father testified he verbally "gave consent to search the house, but not [Chavez's] room." However, the trial court had discretion to disbelieve this testimony, and we must "give almost total deference to [its] determination of historical facts[.]" *See Williams*, 502 S.W.3d at 258. Moreover, Chavez's father also testified that he did not want to interfere with the investigation, that he granted written consent to search his residence without indicating any exclusions, and that his own assumption was "the reason [he] never said, 'you know what, stop.' [He] said [to himself], 'you know what, I'm not stopping him or interfering of what he's doing.'" Chavez does not point to any indication that officers actively misrepresented facts or circumstances to his father or that his father's consent was involuntary. *See Meekins*, 340 S.W.3d at 459–60.

Furthermore, even if officers were mistaken in their belief that Chavez's father had authority to consent to the search of Chavez's bedroom or backpack, the officers reasonably relied upon the consent and the search was lawful. *See Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990). In this case, Chavez's father gave officers permission to search his home in writing, and he agreed during the suppression hearing that his written consent did not place any explicit limitation on the scope of the search. Moreover, Chavez's father was present during the search, and he testified that he did not stop officers from entering Chavez's room. It was objectively reasonable for officers to conclude that the written consent to search the home included consent to search rooms and containers within that home that might contain evidence. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991). We therefore overrule Chavez's first issue.

***Admission of Presumptive Blood Test Testimony***

In his third issue, Chavez argues the trial court erred in admitting the evidence about "presumptive blood stains" over his Rule 403 objection.

*Applicable Law and Standard of Review*

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). "When an objection on 403 grounds is raised at trial, we review the judge's ruling for an abuse of discretion." *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). "The test for whether the trial court abused its discretion is whether the action was arbitrary or unreasonable." *Id*. "An appellate court should not reverse a trial judge whose ruling was within the zone of reasonable disagreement." *Id*. at 440.

*Application*

Before the State's forensic serologist testified, the defense requested a *Daubert* hearing on "the scientific method and technique of the Serology." On voir dire, the forensic serologist, Garon Foster, testified, "Forensic Serology is examination of items that are biological in nature. From a Serological standpoint, it's typically the screening of potential biological material, to determine what may or may not be biological; and then from there, a DNA analysis is conducted on that item."

Foster stated that a chemical test can show that a stain on an item may be blood, and if that "presumptive" test is positive, then a DNA analysis is conducted. But a serologist does not "need

to know the origin of that biological material," for instance, whether it is blood or saliva or sweat epithelial cells, "to create a DNA profile." Foster testified that a report from testing the item would state only "'the possible presence of blood.'" He added, "We have a very sensitive and discriminating test, chemically, for blood that has very few false positives; but, there are false positives out there; hence, we have to call it a 'presumptive.'" Foster explained that a serologist cannot absolutely say that "this substance is blood." He further testified, "That is the standard, the way that it is conducted in the laboratories [and that is the] standard across the country as well as the world." His testimony on this point is consistent with his written report, which never stated, based on a presumptive test, that the stain on the tested item was blood. Foster testified, "I will not be able to state where that DNA came from, other than, it came from that location that we've isolated as a suspected bloodstain."

Foster agreed with defense counsel that this nuance could be confusing to a layperson. The trial court followed up by asking "In other words, the DNA test -- Mr. Foster, am I misunderstanding? -- your DNA test does not confirm the presence of blood necessarily, but it just confirms that there is DNA on the item, correct?" And Foster answered, "That is correct, and that is the standard." Chavez objected on Rule 403 grounds, noting that the mixtures of DNA would mislead the jury. The trial court overruled the objection, "because it looks like that is the standard in the industry, and it is widely accepted -- but, the reason why, is because he is not making absolute declarations."

Foster then explained the two steps of his testing process to the jury: first, serological screening for the possible presence of blood using phenolphthalein as an agent; and second, the DNA profiling. He also explained the "straight to DNA" testing which might be done from a

cutting of a blanket to test for seminal fluid or the butt of a cigarette to test for saliva. He went on to testify about the testing results in this case.

On appeal, Chavez argues that the unfair prejudice "lies in the confusion to the jury that may believe that DNA is being taken from blood, which it is not." In other words, he contends the evidence had the potential to impress the jury in an irrational or indelible way. *See Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

In *Absalon v. State*, one of our sister courts held presumptive test evidence admissible over a *Daubert* challenge, noting there was no evidence indicating the test was improperly performed or inaccurate and that the expert testified the test is "scientifically accepted and regularly used[.]" 478 S.W.3d 1, 16 (Tex. App.—Corpus Christi–Edinburg 2014), *aff'd,* 460 S.W.3d 158 (Tex. Crim. App. 2015). There, the court found it "noteworthy that the trial court admitted evidence of the positive presumptive test on the express condition that the jury be made aware of the subsequent negative confirmatory test." *Id*. Here, as explained above, Foster testified that his lab does not perform confirmatory tests.

But "results of phenolphthalein tests have been recognized by courts of other jurisdictions as admissible, presumptive evidence of the presence of blood, and that in those cases, the presumptive nature of the test has been found to affect the weight, not the admissibility of the evidence." *State v. Pittman*, 18 A.3d 203, 209 (N.J. Super. Ct. App. Div. 2011) (collecting cases). The *Pittman* court found the trial court's admission of the evidence results erroneous because the prosecution had not met the conditions for admissibility recognized in those courts:

> In those cases that have recognized the admissibility of the test results as presumptive evidence of the presence of blood without further confirmatory testing, the limitations of the test and the possibility of false positive results have been fully explained to the jury. In that regard, juries have been informed that the phenolphthalein test can, in addition to manifesting a reaction to blood, give a positive reaction to potatoes, rust, bleach, and nickel[;] that the presence of a

vegetable substance, such as red beets can create a false positive[;] and that 'a host of environmental materials having nothing to do with blood can trigger a positive reaction.' In all such decisions, the admissibility of the presumptive evidence was expressly conditioned on the existence of expert testimony as to the possibility of a false positive.

*Id.* (citations omitted).

In this case, the record shows Foster clearly set out the possibility of a false positive result, both on voir dire[2] and before the jury.[3] Because the jury repeatedly heard that the phenolphthalein test was only presumptive for the presence of blood and did not confirm the stains were in fact human blood, Chavez's argument goes to the weight of the evidence and not to its admissibility. *Cf. Arrick v. State*, 107 S.W.3d 710, 720–21 (Tex. App.—Austin 2003, pet. ref'd) (overruling objection to evidence of presumptive blood test). We conclude that the trial court appropriately exercised its discretion in overruling Chavez's objection. *Mechler*, 153 S.W.3d at 439; *Gigliobianco*, 210 S.W.3d at 641–42. We therefore overrule Chavez's third issue.

## CONCLUSION

Having overruled Chavez's issues on appeal, we affirm the judgment of the trial court.

Beth Watkins, Justice

---

[2] During voir dire, Foster explained that horseradish and rust can give false positives, "therefore, it's not a confirmatory test for blood."

[3] Before the jury, Foster testified that "vegetables, horseradish, certain potatoes, rust, you know, things like these, those may give you a positive reaction; and, therefore, because there are other things, other than blood, that could give you a positive reaction, that's why we have to say it's a possible presence of, for example, blood."